**Order Filed on January 4, 2019
by Clerk, U.S. Bankruptcy
Court - District of New Jersey**

*__NOT FOR PUBLICATION__*

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| In re:<br><br>MICHELANGELO O. RUSSO<br><br>      Debtor. | Chapter 7<br><br>Case No.:     15-24843 (SLM) |
| TIMOTHY LEWIS, CYNTHIA WEBB, PATRICIA MURPHY, AND ROBERT HALTER<br><br>      Plaintiffs,<br>v.<br><br>MICHELANGELO O. RUSSO,<br><br>      Defendant. | Adv. Pro. No.: 16-01214 (SLM) |

### __OPINION ON SUMMARY JUDGMENT__

**APPEARANCES**:

Scott A. Zuber, Esq.
Michael R. Caruso, Esq.
CHIESA SHAHINIAN & GIANTOMASI PC
One Boland Drive
West Orange, New Jersey 07052
*Counsel for Timothy Lewis, Cynthia Webb, Patricia Murphy, and Robert Halter*

Alfredo Ramos, Jr., Esq.
TEMPIO & RAMOS, LLC
102 Belmont Avenue, 1st Floor
Garfield, New Jersey 07026
*Counsel for Michelangelo O. Russo*

**STACEY L. MEISEL, UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding challenges debtor Michelangelo Russo's ("**Debtor**") right to

discharge a *Final Judgment By Default* entered pre-petition in the New Jersey Superior Court (the

"**Judgment**")[1] in favor of plaintiffs Timothy Lewis ("**Mr. Lewis**"), Cynthia Webb ("**Ms. Webb**"),

Patricia Murphy ("**Ms. Murphy**"), and Robert Halter ("**Mr. Halter**") (collectively "**Plaintiffs**"

and, with Debtor, the "**Parties**").   Besides being Debtor's creditors, Plaintiffs are former co-

members with Debtor and investors in an LLC managed by Debtor.   Plaintiffs seek to except the

Judgment from discharge pursuant to section 523 of title 11 of the United States Code

("**Bankruptcy Code**") on the basis of: (a) false pretenses, false representation or actual

fraud; (b) reasonable reliance on a materially false document produced with the intent to deceive

regarding Debtor's financial condition; (c) fraud or defalcation by Debtor while acting in a

fiduciary capacity; (d) embezzlement; (e) larceny; and (f) willful and malicious injury.[2]

Presently before the Court is Plaintiffs' Motion for Summary Judgment ("**Motion**").[3]

Plaintiffs argue summary judgment is warranted because Debtor is collaterally estopped from

relitigating factual issues in this adversary proceeding that are identical to factual issues decided

in favor of Plaintiffs by the Honorable John L. Langan, Jr. of the Superior Court of New Jersey,

Bergen County (the "**State Court**") in the pre-petition state court action ("**State Court Action**")

in which the Judgment was entered.   In the alternative, Plaintiffs argue the undisputed facts support

a finding of non-dischargeability on all six statutory bases.   In opposition, Debtor asserts that, as

a matter of New Jersey law, collateral estoppel does not apply because Plaintiffs obtained the

Judgment by default.   Therefore, the Judgment is not the result of actual litigation amongst the

Parties.   In the alternative, Debtor asserts that multiple disputed facts exist, barring an award of

summary judgment and requiring a trial on the merits.

1

The Court reviewed the pleadings submitted and held oral argument.   The following constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984 and amended September 18, 2012.  This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J) because Plaintiffs object to Debtor's discharge and seek a determination that the Judgment is not dischargeable.  Venue is proper under 28 U.S.C. §§ 1408(1) and 1409(a).

## FACTS AND PROCEDURAL HISTORY[4]

### The Littleton Property

Plaintiffs' financial advisors, Hiro Wakatsuki ("**Mr. Wakatsuki**"), and his partner, Brad Katz ("**Mr. Katz**"), of Premier Wealth Advisors, an investment firm (collectively, the "**Financial Advisors**"), introduced the Plaintiffs to Debtor in early 2012.[5]  The Parties discussed Plaintiffs' potential investment in a real estate project referred to as the "Littleton" (the "**Littleton Project**")—a proposed mixed-use commercial and residential building to be built on Central Avenue in Newark, New Jersey (the "**Littleton Property**").[6]  As part of these discussions, Debtor provided Plaintiffs with an executive summary that contained architectural illustrations of the proposed development.[7]  Mr. Lewis and Mr. Wakatsuki also made on-site visits to the Littleton Property to evaluate Debtor's proposal.[8]

**The Property Schedule**

At some point during their discussions and prior to Plaintiffs' decision to lend, Plaintiffs were presented with a document entitled "Schedule C - Real Estate Owned" (the "**Property Schedule**").[9] The Property Schedule lists 36 parcels of real property located in Jersey City, New Jersey (the "**Whiton Properties**") owned by Whiton Street Associates, LLC ("**Whiton**"). Debtor owns 100% of Whiton.[10]

The Property Schedule was created to assist those involved in the Littleton Project to determine "the properties which [Debtor] owned at the time, the date purchased, the amount, the market value, the current debt and the mortgage[s] [on]" them.[11] The Property Schedule demonstrated the total equity of the Whiton Properties exceeded $5,800,000.[12] However, the Property Schedule failed to disclose known penalties, interest, and tax debt on the Whiton Properties.[13] The Property Schedule also failed to disclose that some of the Whiton Properties were facing foreclosure and Debtor was, at that time, actively involved in workout negotiations with Whiton's lenders.[14]

The Financial Advisors presented the Property Schedule to Plaintiffs. The facts are less clear as to who—Debtor or the Financial Advisors—prepared the Property Schedule. Mr. Lewis testified he understood Debtor created the Property Schedule.[15] Debtor testified the Property Schedule was a "working document" between him and Mr. Wakatsuki.[16] However, Debtor acknowledged the Property Schedule was based, at least in part, on information he provided.[17] To the extent that its underlying information was not provided by him, Debtor believed the Financial Advisors gathered it from the public record.[18] Debtor asserts the Financial Advisors were aware of the pending foreclosures, tax liens, and workout negotiations.[19] Debtor asserts that his understanding was the Financial Advisors disclosed these facts to Plaintiffs.[20] Debtor could not

recall whether he was present when these disclosures were made.[21]    Irrespective, Debtor acknowledged that he did not directly disclose these facts to Plaintiffs because no one explicitly asked him.[22]  Debtor  further agreed the Property Schedule was "not accurate" because it failed to disclose the known liabilities and financial situation of the Whiton Properties.[23]

Mr. Lewis explained Plaintiffs believed that if they invested in the Littleton Project, they would at a minimum, recover the face value of their loan plus interest because if a default occurred, Debtor (as guarantor) possessed valuable assets available to satisfy their claims.[24]  Debtor never made any express oral statement to Plaintiffs about his net worth.[25]    The only financial information Plaintiffs reviewed related to Debtor was the information on the Property Schedule.[26] Ultimately, all the Whiton Properties were foreclosed upon in 2013 and 2014.[27]

**The Parties Made a Deal**

At some time during or after the Parties' discussions, Plaintiffs decided to invest in the Littleton Project.  Debtor presented Plaintiffs with a participation letter, operating agreement, and proposed form of promissory note.  Plaintiffs accepted and signed where necessary, as did Debtor.

1.  **The Operating Agreement**

To facilitate development, operation, and management of the Littleton Project, the Parties jointly created Littleton Associates, LLC (the "**Company**").  On February 23, 2012, the Parties (each as a "**Member**") entered into an operating agreement (the "**Operating Agreement**") for the Company. [28]  As set forth in the Operating Agreement, the Company was formed in accordance with the New Jersey Limited Liability Company Act.  The Operating Agreement explicitly provided that all Members had a duty of undivided loyalty to the Company in all matters affecting the Company's interests.

The Operating Agreement sets forth Plaintiffs' membership and voting interests.   The Operating Agreement indicates that: (i) Mr. Lewis held a ten percent (10%) membership and voting interest; (ii) Ms. Webb held a five percent (5%) membership and voting interest; and (iii) Ms. Murphy and Mr. Halter held a shared five percent (5%) membership and voting interest. PWA Real Estate LLC ("**PWA**"), an affiliate of the Financial Advisors, held another five percent (5%) membership and voting interest.   The Operating Agreement is blank as to the amount of Debtor's membership and voting interests.   However, no one disputes Debtor's membership interest in the Company was 47.5%, and the remaining 27.5% belonged to two other individuals, Pasquale Nocito and Dwight Walker (although their names are not contained anywhere in the Operating Agreement).[29]

The Operating Agreement provides that Members serve the company on a part-time, non-exclusive basis, without a salary.   Members can seek reasonable reimbursement of expenses. However, any employment of a Member by the Company requires entry into a written employment agreement with the Company, with "reasonable compensation as determined by the Members."[30] The Operating Agreement contained a specific provision in regard to the Debtor.   It provides as follows:

> Michelangelo Russo is hereby appointed the Member Manager of the Company. The Member Manager shall have duties in the day to day operations of the Company. The Member Manager has the power to perform all things in the normal course of business and for the usual operation of the Company without prior approval of the other Members. The Member Manager shall not be compensated for his services as Member Manager, but may be reasonably compensated as determined by the Members under a written employment agreement.[31]

Debtor never entered into a separate written employment agreement with the Company.

The Operating Agreement also authorized the entry and maintenance of Company bank accounts.  The Company's books and records were to be maintained at its principal office, kept on a calendar year basis, and closed and balanced at year-end.   The Operating Agreement also expressly required entry of all known business transactions of the Company to be entered and recorded in the Company's books.  The Operating Agreement required the Company to furnish annual financial statements to the Members and prepare tax returns providing copies to all Members.  As Managing Member, Debtor never discharged those reporting or filing obligations.[32]

### 2.  **The Original Notes**

In February and April 2012, Plaintiffs executed four separate promissory notes with the Company in the amount of $125,000 each for a total of $500,000 (collectively, the "**Original Notes**").[33]  By their express terms, the Original Notes pertained to the Littleton Project.  Plaintiffs understood their loan proceeds were to be used for the Company's ordinary course business expenses.[34]  The Original Notes matured within a year of their execution, with interest accruing at ten percent (10%) per annum.[35]  The Original Notes are unsecured.  Each Original Note contains the express provision that it is personally guaranteed by the Debtor and was signed by Debtor in his capacity as President of the Company and Guarantor.  Other than this express provision, the Debtor did not execute a separate guaranty.

Debtor represented to the Financial Advisors that he had the financial ability to guarantee the Original Notes.[36]  However, it is undisputed that Debtor's federal income tax returns show income of $8,895, $7,554, and $7,035 for the years 2009, 2010, and 2011, respectively, and losses of $162,173, $128,079, and $193,809 for the years 2012, 2013 and 2014, respectively.[37]

Mr. Lewis testified that he did not review any of Debtor's personal financial documents prior to entering into the Original Notes transaction. [38]  Rather, Plaintiffs relied solely upon the

erroneous Property Schedule and their belief, as stated by Mr. Lewis, that Debtor was a "successful business guy, standing behind" his guarantee.[39]

**The Checking Accounts**

Debtor utilized the funds Plaintiffs loaned to the Company as initial deposits to open two small business checking accounts for the Littleton Project. Both bank accounts were located at Capital One Bank, with the first account ending in 6732 ("**Checking Account 1**") and the second account ending in 5526 ("**Checking Account 2**") (collectively referred to as the "**Checking Accounts**").

### 1.   **Checking Account 1**[40]

On February 27, 2012, Debtor deposited the $125,000 proceeds of the first Original Note into Checking Account 1. From February until the account closed in July 2012, the account statements show that Debtor made additional cash or check deposits totaling $10,500. All other transactions were withdrawals, debits, transfers, or *de minimus* return credits. Significantly, Checking Account 1 had a negative balance by April 23, 2012, which was the day before Debtor opened Checking Account 2. Withdrawals from Checking Account 1 during the relevant time period included payments to: the Italian luxury clothing store Ferragamo (a $4,785 debit on March 26, 2012); retail and on-line stores such as Apple iTunes, Nike.com, Best Buy, Bed Bath & Beyond, and Sunglass Hut; daily debits for food and restaurants; and other personal expenses. On May 1, 2012, Debtor transferred $1,992.44 from Checking Account 2 to Checking Account 1 to cover a negative balance, as of April 26, 2018, of $1,992,44. As mentioned, Debtor deposited only

an additional $10,500 into Checking Account 1 during its lifetime; all other funds were sourced from the $125,000 initial deposit of Plaintiffs' loan proceeds.

### 2. **Checking Account 2**[41]

On April 24, 25, and 27, 2012, Debtor deposited the remaining $375,000 of the $500,000 loaned by Plaintiffs to open Checking Account 2. From April 2012 until the account closed in March 2013, the account statements for Checking Account 2 show that Debtor made the following cash or check deposits in addition to the initial deposit (collectively, the "**Debtor Deposits**"):

| Date | Amount |
|------|--------|
| 5/17/2012 | $3,000 |
| 6/19/12 | $4,000 |
| 6/27/12 | $5,500 |
| 7/9/12 | $6,500 |
| 7/10/12 | $2,000 |
| 8/9/12 | $5,000 |
| 8/20/12 | $45,500 |
| 8/22/12 | $1,000 |
| 9/7/12 | $12,002.22 |
| 9/20/12 | $3,000 |
| 9/21/12 | $1,500 |
| 10/3/12 | $1,500 |
| 10/4/12 | $4,300 |
| 10/12/12 | $1,200 |

| Date | Amount |
|------|--------|
| 11/9/12 | $500 |
| 11/14/12 | $5,000 |
| 11/29/12 | $12,000 |
| 12/6/12 | $6,000 |
| 12/13/12 | $4,100 |
| 12/14/12 | $500 |
| 12/14/12 | $2,200 |
| 12/18/12 | $3,000 |
| 12/24/12 | $1,200 |
| 1/2/13 | $2,500 |
| 1/4/13 | $1,200 |
| 1/4/13 | $2,000 |
| 1/4/13 | $500 |
| **Total** | **$136,702.22** |

Besides those deposits, Debtor also withdrew $75,300 on September 21, 2012, and then deposited $75,000 on September 25, 2012 (the "**September Deposit**").  All other transactions recorded in the bank statement were withdrawals or debits.  Debtor asserts he deposited $228,915.91 of his own money into the Checking Accounts, which approximates the amounts he deposited into the Checking Accounts, exclusive of the September Deposit.[42]

By January 15, 2013, Checking Account 2 also had a negative balance.  Withdrawals from Checking Account 2 included, among other things:  daily debits for food and restaurants; a vacation to the Bahamas (including a visit to the Atlantis Spa); and purchases at retail stores such as Bed Bath and Beyond, FAO Schwartz, and Bloomingdales.

Debtor admits some of the aforementioned purchases from the Checking Accounts were for personal expenses, but maintains the vast majority were associated with the pre-development stages of the Littleton Project.[43]  Debtor also admits that his failure to keep personal and business expenses separate was an error on his part.[44]  Debtor never disclosed any of the personal purchases to Plaintiffs made from either of the Checking Accounts.[45]  Debtor asserts these personal expenses were paid out of the monies he personally deposited into the Checking Accounts.[46]  It is undisputed

9

Debtor's federal income tax returns show a loss of $162,173 for the year 2012. Debtor could not recall his source of income between February and April.[47] Checking Account 1 was closed in July 2012, and Checking Account 2 was closed in March 2013.

**The Hasbrouck Heights Property**

The most controversial withdrawal from Checking Account 2 occurred on June 19, 2012 in the amount of $55,000 (the "**Hasbrouck Heights Withdrawal**").[48] Debtor used the $55,000 withdrawal to place a deposit on, and eventually purchase, real property located at 230 Pasadena Avenue, Hasbrouck Heights, New Jersey (the "**Hasbrouck Heights Property**"). The Hasbrouck Heights Property was in no way connected to the Littleton Project nor was its purchase authorized by the Company's corporate documents or the Plaintiffs. Debtor admits to making the Hasbrouck Heights Withdrawal from Checking Account 2 for his own personal purpose, but asserts it was sourced from amounts he personally deposited into the Checking Accounts.[49] Contrary to Debtor's assertion, the records show that at the time of the Hasbrouck Heights Withdrawal, Debtor had only deposited $7,000 in Checking Account 2.[50] Even with crediting the previous deposits made into Checking Account 1, as of June 19, 2012, the Debtor's total deposits into the Checking Accounts only equals approximately $18,000, which is substantially less than the $55,000 used as a deposit for the Hasbrouck Heights Property. Plus, such a liberal credit fails to account for the personal expenses Debtor already paid out of the Checking Accounts.

Three months after signing the purchase contract for the Hasbrouck Heights Property, Debtor formed 230 Pasadena LLC ("**230 Pasadena**") to serve as the buyer on the transaction.[51] Soon thereafter, Debtor replaced himself as the sole member of 230 Pasadena with his sister, Maria Grace Billings. The purchase contract was later amended to reflect 230 Pasadena as the buyer.[52] By Deed dated December 2012, 230 Pasadena received title to the Hasbrouck Heights Property

10

for a purchase price of $167,500.[53]  In September 2013, 230 Pasadena sold the Hasbrouck Heights Property for $377,500.[54]  Plaintiffs never received notice of the transaction.[55]  Plaintiffs never knew about the Hasbrouck Heights Withdrawal  from Checking Account until long after the purchase/sale of the Hasbrouck Heights Property was over and done.  Plaintiffs never received any sale proceeds from the Hasbrouck Heights Property transaction.[56]

**The Littleton Project Unravels**

In February 2013, the Company defaulted on three of the Original Notes,[57] with a subsequent default on the fourth Original Note in April 2013.[58]  At that time, Plaintiffs assert that Debtor requested a maturity extension on the Original Notes.[59]  Mr. Lewis testified that when Plaintiffs granted the extension, he and the other Plaintiffs believed "everything was still in good order" and they had "no indication that there were problems."[60]  Debtor admits that an extension occurred, but denies that he requested it.[61]  Rather, Debtor asserts that the Financial Advisors and the "rest of the partners" requested the extension.[62]  In April 2013, Plaintiffs granted a one-year extension of the maturity date of the Original Notes to April 2014 ("**Extended Notes**").[63]  The Extended Notes also provided that the-then current interest amount due under each of the Original Notes, which totaled $50,000, was to be paid to Plaintiffs no later than June 15, 2013 (the "**June Interest Payment**").[64]

Significantly, prior to entry into the Extended Notes in April 2013, (1) Debtor already depleted and closed both Checking Accounts (without any disclosure to Plaintiffs) by January 2013;[65] and (2) the Littleton Project itself had become a factual impossibility because PSE&G had either purchased, or was in the process of purchasing, the Littleton Property in a transaction completely unrelated to the Company.[66]  In other words, the money was gone and the Littleton Property was

11

too.  So, the Company had no way of fulfilling its purpose as it was broke and the Littleton Property was either sold or being sold to someone else.

There is disagreement between the Parties as to whether Plaintiffs had notice or knowledge of the PSE&G sale prior to their agreement to the extension.  Debtor asserts that he learned of PSE&G's purchase of the Littleton Property in early 2013 when it became "public knowledge" and that, as a result, Plaintiffs were "as privy to it as [he] was[.]"[67]  Debtor said that when he found out about the sale, it was immediately disclosed to Plaintiffs.[68]  Debtor further stated that a "verbal disclosure" was made to Plaintiffs, again in the presence of the Financial Advisors, but that he could not precisely recall the details of that disclosure.[69]

Plaintiffs dispute this assertion.[70]  Plaintiffs assert that, months after issuance of the Extended Notes, they learned of the Littleton Property's sale in late summer 2013 via a news article in the *Newark Star Ledger* that Ms. Murphy found and shared with the other Plaintiffs.[71]  After reviewing this article, Mr. Lewis testified that he and the other Plaintiffs asked the Debtor about the status of the Littleton Property and that the Debtor simply advised them it was "no longer available."[72]  Plaintiffs cite the absence of any written communication from Debtor to Plaintiffs verifying his alleged disclosure.[73]  Debtor acknowledges the lack of any written disclosure.[74]  So, a factual dispute remains as to when Plaintiffs found out about the sale of the Littleton Property to PSE&G.

On June 15, 2013, the Company failed to make the June Interest Payment.[75]  The Parties engaged in a course of emails regarding the payments due.  Ultimately, those communications ceased.

**The State Court Action**

1. **The Judgment**

In August 2013, Plaintiffs filed a state court complaint against the Debtor entitled: *Timothy Lewis, Cynthia Webb, Patricia Murphy, and Robert Halter, v. Michelangelo Russo, et al.*, Superior Court of New Jersey, Law Division, Bergen County, Docket No. BER-L-6532-13, commencing the State Court Action (the "**State Court Complaint**").[76]  The State Court Complaint includes the following counts: (i) Breach of Promissory Notes; (ii) Fraud; (iii) Breach of Contract; (iv) Breach of Fiduciary Duty and Duty of Loyalty; (v) Conversion; (vi) Constructive Trust; (vii) Oppressed Minority Interest Holders; and (viii) Unjust Enrichment.  The State Court Complaint alleges the following facts as being common to all counts:[77]

- Plaintiffs were the "innocent victims of [Debtor's] scheme of fraud, conversion and theft regarding over $550,000 in principal and interest presently due and owing" by Debtor as Guarantor on the Original Notes and Extended Notes.[78]

- To induce Plaintiffs to loan the money for the Littleton Project, in February 2012, Debtor provided Plaintiffs with the Property Schedule.[79]

- The Property Schedule was false and misleading because it failed to disclose that the properties listed therein were subject to loans and liens.[80]

- Plaintiffs did not know, nor had any reason to suspect, that the Property Schedule was false and that it was provided to them with the "specific intent of deceiving Plaintiffs and inducing Plaintiffs to loan the requested money."[81]

- Plaintiffs relied on the Property Schedule and the Debtor's "false, misleading, and fraudulent misrepresentations" to their detriment.[82]

- The Parties entered into the Operating Agreement, which was prepared by the Debtor.[83]

- Debtor had "complete control of the daily operations" of the Company and the Littleton Project.[84]

- Debtor had an "undivided duty of loyalty" to the Company.[85]

- Debtor "failed to acquire title" to the Littleton Property, "yet never divulged this failure to Plaintiffs and never disclosed to Plaintiffs that PSE&G had acquired title to the Littleton Avenue property in approximately February 2013, thereby destroying and rendering impossible" the Littleton Project.[86]

- Although Debtor "knew that PSE&G had purchased the [Littleton Property] in February 2013," Debtor "continued to deceive Plaintiffs by fraudulently misrepresenting to them that the [Littleton Project] was merely delayed and that only some additional time was needed for [Debtor] to complete the project and repay the $500,000 loan plus interest to Plaintiffs, along with any realized profit."[87]

- "Pursuant to these fraudulent misrepresentations, two months after [Debtor] knew that PSE&G had purchased the [Littleton Property]," Debtor "persuaded Plaintiffs to sign" the Extended Notes.[88]

  - "In September 2012, months after Plaintiffs loaned the money, [Debtor] formed [230 Pasadena] for the sole purpose of purchasing the Hasbrouck Heights Property with Plaintiffs' money. Upon information and belief, [230 Pasadena], under the complete control of [Debtor], executed the sales contract in December 2012 and purchased the Hasbrouck Heights Property with Plaintiffs' money at a closing in February 2013. All of the foregoing wrongful conduct occurred prior to the aforesaid fraudulent misrepresentations that induced Plaintiffs to execute [the Extended Notes] in April 2013."[89]

  - "The monies loaned by Plaintiffs to [Debtor and the Company] have been diverted, misappropriated, stolen and/or converted by [Debtor] for his own illicit benefit and gain and the illicit benefit and gain of some or all of the other Defendants." [90]

  - Debtor defaulted on the Extended Notes and the June Interest Payment. [91]

  - "At all times, [Debtor] has had exclusive and unfettered control of Plaintiffs' loan monies and the business operations of [the Company and Debtor's affiliate companies]. Plaintiffs have not received any payments, information or disclosures from [Debtor] regarding the loan monies or the aforesaid business operations."[92]

In connection with their constructive trust claim, Plaintiffs recorded a *Notice of Lis Pendens* (the "***Lis Pendens***") against the Hasbrouck Heights Property.[93]  Plaintiffs "claim[ed] an interest in the Hasbrouck Heights Property" and asserted a "lien or other encumbrance in the Hasbrouck Heights Property, which would affect title to that property."[94]

Debtor hired The Vazquez Law Firm (Peter Vazquez, Esq., appearing) to represent him in the State Court Action and filed an answer in November 2013 ("**Answer**").  Debtor denied

Plaintiffs' factual allegations, asserting fourteen (14) "Separate/Affirmative Defenses."[95]  As the State Court Action proceeded beyond pleadings, Debtor failed to comply with discovery requests made by the Plaintiffs.  Ultimately, the Clerk of the State Court entered default.[96]

In October 2014, Judge Langan entered an Order in the State Court Action suppressing and striking the Answer with prejudice pursuant to New Jersey Court Rule 4:12-5(a)(2) for Debtor's failure to fulfill his discovery obligations.[97]  The Debtor never appealed nor sought to vacate the October 2014 Order.  On November 5, 2014, Judge Langan entered the Judgment in the amount of $797,522.83 as of October 29, 2014.[98]  The Debtor never appealed nor sought to vacate the Judgment.  However, the State Court Action did not end there because the *Lis Pendens* still remained on the Hasbrouck Heights Property.

## 2.  **The State Court Opinion**

On February 12, 2015, in accordance with an Order entered December 19, 2014, Judge Langan conducted an evidentiary hearing in the State Court Action regarding the *Lis Pendens* and whether it should be continued or discharged.[99]  Debtor did not participate in the evidentiary hearing, although he had the opportunity to participate and still remained a defendant.[100]  Plaintiffs alleged that they were entitled to the *Lis Pendens* against the Hasbrouck Heights Property because their loan proceeds were "diverted without their permission and used to purchase" the Hasbrouck Heights Property "before selling it" to the new owners.[101]  As previously stated, 230 Pasadena sold the Hasbrouck Heights Property in 2013.  The new owners intervened as defendants (the "**Intervening Defendants**") in the *lis pendens* portion of the State Court Action.[102]  In support of their positions, the parties (minus the Debtor) presented witnesses and submitted evidence, including the Operating Agreement, the Original Notes, the check deposits related to the Original Notes, correspondence from Debtor verifying his purchase of the Hasbrouck Heights Property, a

15

copy of the cashier's check used to make the deposit for the Hasbrouck Heights Property, and the

Property Schedule.[103]

In March 2015, Judge Langan issued an Opinion in which he found that the $55,000 used

as a deposit for the Hasbrouck Heights Property was sourced from Plaintiffs' loan proceeds ("**State**

**Court Opinion**").[104]  Judge Langan determined:

> [i]t was . . . quite evident on cross examination [of Mr. Lewis] that
> the $55,000 came from the Littleton monies meant to develop the
> [Littleton Property], and that *Mr. Russo diverted it to acquire the*
> *230 Pasadena property in the name of 230 Pasadena, LLC*.  Mr.
> Russo also formed 230 Pasadena LLC for the purpose of acquiring
> the property in Hasbrouck Heights, naming himself as the sole LLC
> member and then later transferring that interest to his sister.
>
> *Mr. Lewis did establish to this Court's satisfaction that the $55,000*
> *for the down payment on the Hasbrouck Heights property was*
> *taken out of the $500,000 put into Littleton by the Plaintiffs.*[105]

Judge Langan found the evidence demonstrated that Debtor made "numerous deposits" in

an approximate amount of $150,000 into the Checking Accounts, and there were "numerous

checks written" for purposes that "appear[ed] to legitimately concern" the Littleton Property, such

as payments to "attorneys, engineers, architects and other professionals."[106]  Nonetheless, Judge

Langan also found that Debtor inflicted "significant harm" on both the Plaintiffs and the

Intervening Defendants as a result of his diversion of Plaintiffs' loan proceeds away from the

Company.[107]  Judge Langan stated that the Intervening Defendants and Plaintiffs:

> *were harmed by the actions of Mr. Russo*, which is obvious from
> the testimony elicited before this Court and the documents
> presented.  *[The Plaintiffs] have lost a substantial amount of*
> *money, and the [Intervening Defendants] currently have their*
> *property encumbered after acquiring it in a sale from an*
> *unscrupulous businessman.*  The informal manner in which Mr.

> Lewis became involved in lending monies to Mr. Russo and his companies makes how unforeseen this harm was to the Plaintiffs even more clear.[108]

Accordingly, Judge Langan permitted the *Lis Pendens* to remain in place pending trial.[109]

On April 8, 2015, Judge Langan entered an Order regarding the State Court Opinion (the "***Lis Pendens* Order**").[110]  In the *Lis Pendens* Order, Judge Langan ordered that the *lis pendens* would "remain in place . . . to reflect a lien not to exceed $55,000 encumbering" the Hasbrouck Heights Property "pursuant to the findings and ruling set forth" in the State Court Opinion.[111]  Ultimately, Plaintiffs and Intervening Defendants settled.[112]  No one ever appealed the *Lis Pendens* Order.

**Debtor Files for Bankruptcy**

On August 6, 2015, approximately five (5) months after issuance of the State Court Opinion and four (4) after entry of the *Lis Pendens* Order, Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.[113]  Debtor listed the Judgment on Schedule F, and identifies "Cynthia Webb c/o Chiesa, Shahinian & Giantomasi PC" as a named creditor.[114]  The other Plaintiffs are identified as creditors in Debtor's creditor matrix, also care of Chiesa, Shahinian & Giantomasi PC.  Debtor failed to designate the Judgment as disputed, contingent, or liquidated—although such designation is required on the Schedules.[115]

Plaintiffs timely commenced the Adversary Proceeding.[116]  The Adversary Complaint requests the Court: (1) declare the Judgment non-dischargeable under sections 523(a)(2)(A) and (B), 523(a)(4) and 523(a)(6) of the Bankruptcy Code; and (2) fix the Judgment in the amount of $811,041 plus reasonable attorneys' fees and costs incurred in connection with this Adversary Proceeding.  On April 19, 2016, Debtor filed an Answer denying all substantive allegations, and raising numerous affirmative defenses.[117]  On August 16, 2016, Debtor sought leave to amend his answer, file a third party complaint against the Financial Advisors, and requested an extension of

the discovery end date.[118]  Plaintiffs filed a timely objection.[119]  After a hearing on the matter, the

Court denied Debtor's leave requests.[120]  Debtor never appealed that decision.

Plaintiffs filed the instant Motion for Summary Judgment and their *Statement of Undisputed Material Facts*.[121]  Debtor filed opposition to Summary Judgment (the "**Opposition**") and a *Responsive Statement of Material Facts and Supplemental Statement of Disputed Material Facts Pursuant to Civ. R. 56.1* (including a supplemental statement of disputed material facts) (the "**Responsive Statement**").[122]  Plaintiffs filed a reply to the Opposition,[123] arguing, among other things, that the entirety of their *Statement of Material Facts* should be deemed admitted for purposes of summary judgment because the Opposition violated District of New Jersey Local Rule 56.1(a).[124]  Debtor subsequently filed a *Motion for Leave to File a Sur Reply*, and, without any permission from this Court, attached the proposed Sur Reply.[125]  Plaintiffs opposed the Court's consideration of the Sur Reply because it was untimely and had been filed without prior approval of the Court.[126]  For the reasons set forth on the record, the Court overruled Plaintiffs' opposition and permitted Debtor's Sur Reply to remain in the record.[127]  The Court held oral argument.  This decision follows.

## DISCUSSION

Courts do not grant or treat motions for summary judgments lightly.  Federal Rule of Civil Procedure 56(a), made applicable to this action by Federal Rule of Bankruptcy Procedure 7056, provides that the court shall "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion."[128]  "A fact is material when its resolution might affect the outcome of the suit under governing law and a dispute about

a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[129]

Initially, it is the movant's burden to demonstrate there are no genuine disputes of material fact.[130] Once satisfied, the burden then shifts to the nonmoving party, who must present evidence establishing that a genuine issue of material fact exists making it necessary to resolve the difference at trial.[131]

Inferences and facts should be construed in the light most favorable to the non-moving party.[132] Critically, a motion for summary judgment will not be defeated by "the mere existence of some disputed facts."[133] Parties opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."[134] The non-movant may not rely on mere allegations but must present actual evidence raising a genuine dispute of material fact.[135] Thus, only disputes over facts "that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."[136] Further, if a "party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[137] Accordingly, a court may treat a non-moving party's statement that it can neither agree nor disagree with a statement of undisputed material fact as an admission that the fact is not in dispute, particularly where the record supports such a factual finding.[138]

Summary judgment may be proper even though some material facts remain disputed if, after all inferences are drawn in favor of the non-moving party, the moving party is entitled to judgment as a matter of law.  "[T]he inquiry involved in a ruling on a motion for summary judgment…necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[139]

The Third Circuit has held that the purpose of summary judgment is to avoid an unnecessary trial which results in delay and expense, by promptly disposing of any actions in which there is no genuine dispute of material fact.[140]   However, summary judgment is characterized as a "drastic remedy."[141]  The Third Circuit has stated that "where there is the slightest doubt as to the facts," summary judgment may not be granted.[142]   At the summary judgment stage, therefore, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial."[143]

In this case, Plaintiffs first move for summary judgment based on the doctrine of collateral estoppel, or issue preclusion.  Plaintiffs argue that there is an identity of issues between the State Court Action and this adversary proceeding, and the Judgment is final as to those identical issues, namely Debtor's fraud, breach of fiduciary duty, embezzlement, conversion, and willful or malicious injury.  Moreover, Plaintiffs argue that Judge Langan, in the context of issuing the State Court Opinion and *Lis Pendens* Order, looked at the same evidence that is currently before this Court and held that Debtor (1) inappropriately "diverted" $55,000 from the Checking Accounts for the purchase of the Hasbrouck Heights Property and (2) inflicted "significant harm" on Plaintiffs' economic interests as a result.[144]  Plaintiffs argue that requiring re-trial of these issues in bankruptcy would impose an undue cost and burden on them.  In the alternative, Plaintiffs submit that the evidence before this Court establishes by a preponderance of the evidence that Debtor's actions or omissions violate at least one, if not all, of the relevant provisions of section 523(a).  Plaintiffs argue that, even if the Court found only one section of 523(a) is satisfied, the Judgment may be excepted from discharge in its entirety.

Debtor argues that collateral estoppel is inapplicable because it requires actual litigation and entry of a final judgment on the merits.[145]  Debtor's position is that the Judgment and State

Court Opinion were not a result of active litigation between the Parties in the State Court. Therefore, no issues were resolved in State Court and all must be tried by this Court. Debtor also asserts that Plaintiffs failed to meet their burden under section 523 as factual issues exist on several fronts. First, Debtor argues that he cannot be held liable for the misstatements on the Property Schedule because they were prepared and presented to Plaintiffs by their Financial Advisors. Second, Debtor argues that he only used the monies he deposited into the Checking Accounts to fund his personal purchases, including the Hasbrouck Heights Property. Third, Debtor argues that he used Plaintiffs' loan proceeds solely for legitimate Company business expenditures. Accordingly, Debtor seeks a bench trial on the merits.

### A. Collateral Estoppel

The doctrine of collateral estoppel, or issue preclusion, prevents a party from relitigating issues that were adjudicated in a prior lawsuit, and applies in bankruptcy discharge proceedings.[146] A bankruptcy court may apply collateral estoppel to accept the findings of facts and conclusions of law established by the record of a prior adjudication as evidence supporting non-dischargeability.[147] Collateral estoppel, however, does not eliminate the bankruptcy court's authority and obligation to decide whether a debt is non-dischargeable.

The Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to "give [a] state court judgment the same preclusive effect that it would be given in courts of the rendering state."[148] To determine the preclusive effect of a prior state court proceeding, a federal court looks to the law of the adjudicating state.[149] Here, the Judgment was entered in the New Jersey Superior Court. Thus, the doctrine of collateral estoppel as articulated by New Jersey courts applies. A party asserting collateral estoppel in New Jersey must show that:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding;

(2) the issue was actually litigated in the prior proceeding;

(3) the court in the prior proceeding issued a final judgment on the merits;

(4) the determination of the issue was essential to the prior judgment; and

(5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.[150]

But, "[e]ven where [the elements of collateral estoppel] are met, the doctrine, which has its roots in equity, will not be applied when it is unfair to do so."[151]  Courts interpreting New Jersey's doctrine of collateral estoppel provide additional guidance as to the state's five-prong test.

First, "[t]o invoke preclusion . . .  the subsequent action must involve substantially similar or identical causes of action, issues, parties and relief as were involved in the prior action."[152]  A prior decision on "that issue is conclusive in any subsequent action between the parties on either the  same or different claim."[153]  Second, an issue is actually litigated when it is "properly raised, by the pleadings or otherwise . . . and is determined."[154]  "Actual litigation" requires that the defendant in the initial action had an "opportunity to fully and actively participate in the actual trial, and the manner in which the trial was conducted merit[s] a bar to re-litigation of the issues determined." [155]  In other words, the party against whom the doctrine will be applied "had his day in court" on the issue in the previous litigation.[156]  Third, collateral estoppel applies when "issue[s] of ultimate fact [have] been determined by a valid and final judgment."[157]  "For purposes of issue preclusion . . . 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect."[158]  A judgment is sufficiently final where there is nothing to indicate that the "court has any intention of revisiting the issue . . ., that its findings are unreliable, that [the losing party] did not have sufficient opportunity to be heard before the court entered judgment, or that the . . . court gave insufficient consideration to the

issue."[159]  Fourth, collateral estoppel applies "to those [matters and facts] necessary to support the judgment rendered in the prior action."[160]  Fifth, the party against whom the doctrine is asserted in the subsequent action had to have been "a party to or in privity with a party to the earlier proceeding."[161]

A determination of the applicability of collateral estoppel requires a court to conduct "a careful review of the record of the prior case, a hearing at which the parties have the opportunity to offer evidence, and the making of findings of fact and conclusions of law."[162]  "Where a judgment is 'decided from the bench' and not supported by specific findings of fact, courts determining the identity of the issues have inferred that an issue was decided by a prior court so long as it is a 'necessary inference' from the prior court's judgment."[163]

Factors "favoring application of issue preclusion are: conservation of judicial resources; avoidance of repetitious litigation; and prevention of waste, harassment, uncertainty and inconsistency."[164]  Factors that disfavor application include: "the party against whom preclusion was sought could not have obtained review of the judgment in the initial action; the quality or extensiveness of the procedures in the two actions were different; it was not foreseeable at the time of the initial action that the issue would arise in subsequent litigation; and the party sought to be precluded did not have an adequate opportunity to obtain a full and fair adjudication in the first action."[165]

Here, no dispute exists that the factual allegations underlying the State Court Action and this Adversary Proceeding relate to the same underlying causes of action—fraud, conversion, misappropriation of Plaintiffs' loan monies in violation of the Original Notes and the Operating Agreement and breach of fiduciary duty.[166]  None of the Parties dispute that they are each a party to both litigations.  The Parties disagree on whether the factual issues necessary for summary

judgment in this case were "actually litigated" in the State Court Action.  Generally, in New Jersey,

collateral estoppel may not be applied in the case of a default judgment because of a lack of "actual

litigation."[167]    Indeed, numerous decisions reviewing New Jersey law suggest that collateral

estoppel would not apply "even if the defendant had notice and willfully declined to participate in

the proceedings, or participated to [a limited] extent."[168]    On the other hand, there is "no clear

standard for determining whether collateral estoppel applies to prevent relitigation of issues

following entry of a default judgment as a discovery sanction."[169]    Rather, "[a]nalysis is made on

a case-by-case basis and is factually dependent, which is consistent with the application of an

equitable doctrine."[170]

Plaintiffs argue that the Third Circuit's decision in *In re Docteroff* is squarely on point.[171]

In *Docteroff*, the Third Circuit analyzed "whether a default judgment entered against a defendant

in a [federal] fraud action as a sanction for [his] repeated and bad-faith refusals to comply with

discovery requests" collaterally estopped him from "claiming that the debt underlying the [default]

judgment [was] dischargeable in bankruptcy."[172]    The *Docteroff* plaintiffs commenced a

prepetition federal lawsuit against the debtor-defendant on the basis that he improperly diverted

certain funds from his former company to pay down debt owed to him.[173]    In the months following

initiation of the action, the debtor "repeatedly and in bad faith refused to submit to properly noticed

depositions or respond" to numerous document production requests.[174]    As a sanction for debtor's

discovery conduct, the District Court, pursuant to Federal Rule of Civil Procedure 37(d), entered

default judgment against the debtor-defendant on the issue of liability and scheduled a trial for

damages.[175]    On the trial date, the debtor-defendant filed for bankruptcy.

The *Docteroff* plaintiffs subsequently commenced an adversary proceeding against the

debtor, arguing that the default judgment collaterally estopped debtor from "denying that he had

24

defrauded and embezzled money from them[.]"[176]   Because plaintiffs' debt had been incurred by

means of debtor's fraud, plaintiffs argued that it was non-dischargeable pursuant to 11 U.S.C.

§ 523(a)(2)(A), (a)(4) and (a)(6).   On cross motions for summary judgment, the Bankruptcy Court

entered judgment for the plaintiffs.   The Bankruptcy Court held that the District Court's order had

"collateral estoppel effect and that the allegations in the [underlying District Court action]

established that, by his actions . . . debtor had engaged in fraud, embezzlement, and fraud while

acting in a fiduciary capacity, and caused [plaintiffs] willful and malicious injury."[177]   The District

Court affirmed, and the debtor appealed.

Applying the federal law of collateral estoppel, the Third Circuit examined whether the

*Docteroff* debtor was estopped from relitigating the factual issues of his fraud, embezzlement,

fraud while in a fiduciary capacity, and willful and malicious injury to plaintiffs-appellees on the

grounds that: (1) the issues to be precluded were the same as those involved in the prior District

Court action; (2) the issues were actually litigated; (3) the issues were determined by a valid and

final judgment; and (4) the determination of the factual issues was essential to the prior

judgment.[178]   The Third Circuit found that the first and fourth elements were satisfied because "all

of the elements of the relevant dischargeability provisions [we]re encompassed by the allegations

made" in the underlying District Court complaint.[179]   As to the second element, the Third Circuit

found that debtor "had every opportunity to fully and fairly litigate any relevant issue in the District

Court," and that he "simply elected not to comply with court orders."[180]   In the Third Circuit's

view, that selective participation distinguished *Docteroff* from "a typical default judgment where

a defendant neglects or elects not to participate in any manner because of the inconvenience of the

forum selected by the plaintiffs, the expense associated with defendant the lawsuit, or some other

reason."[181]   Rather, the debtor "participated extensively in the lawsuit," in which "[h]e filed an

answer, noticed [a] deposition, engaged several lawyers, including local counsel, filed papers with the court, and corresponded with opposing counsel."[182]  Lastly, as to the third element, the Third Circuit held that the default judgment was adequately final for purposes of collateral estoppel.  The Third Circuit observed that "for purposes of issue preclusion, final judgment includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded preclusive effect."[183]

   Absent any indication from the District Court that it intended to revisit its judgment, the Third Circuit found it final for purposes of collateral estoppel.  In fact, the Third Circuit observed that it was the debtor's bankruptcy filing that prevented the District Court from proceeding to trial on damages and entering final judgment.  That the automatic stay prevented it from doing so was an inadequate basis for challenging the finality of the District Court's decision.  Based on those facts, the Third Circuit held it was consonant with the federal law of collateral estoppel that the default judgment be given preclusive effect to prevent relitigation of the issues of debtor's fraud, embezzlement, breach of fiduciary duty, and willful and malicious injury.[184]

Here, Debtor attempts to distinguish *Docteroff* because it was decided under the federal standard for collateral estoppel, instead of New Jersey law.  Debtor argues that New Jersey law provides a higher bar, and does not recognize default judgments as meeting the second-prong of "actual litigation" of its collateral estoppel doctrine.[185]  Debtor further argues that, unlike the debtor in *Docteroff*, there is no evidence that the Judgment was entered as a result of Debtor's "bad faith or repeated refusals to comply with discovery obligations."[186]   Rather, here, the Court only "know[s] that [Debtor] failed to comply with discovery demands on at least one occasion[.]"[187]  Therefore, Debtor argues that *Docteroff* should not apply.

At least one Bankruptcy Court in this District applied *Docteroff* to a New Jersey state court default judgment and was upheld on appeal in doing so.[188]  In  *Walters v. Tehrani*, the debtors sought appeal from an order of the Bankruptcy Court granting summary judgment to a creditor seeking non-dischargeability of their debt based on debtors' actual fraud.[189]  The facts in *Walters* have some similarities to the case at bar.  The claim at issue in *Walters* arose out of a loan transaction between the debtors and the creditor.  The *Walters* debtors "owned several entities that invested in real estate properties" and, like Plaintiffs, creditor made "several loans" to the debtors and these entities.[190]  In *Walters*, the creditor was assured that these loans would be secured by first liens on the properties.[191]  Instead, the debtors provided false documentation of the creditor's security interest and falsified other insurance documentation.[192]  Creditor and other similarly situated persons brought a lawsuit against the debtors in New Jersey Superior Court.[193]  After providing the debtors with multiple opportunities to correct their discovery deficiencies, the New Jersey state court judge entered an order suppressing the debtors' defenses.[194]  The debtors sought reconsideration, which the state court denied with prejudice, finding that debtors demonstrated bad faith in their repeated failures to respond to creditor's discovery requests.[195]

Shortly thereafter, the debtors filed for Chapter 7 bankruptcy relief.[196]  Upon the creditor's request, the Bankruptcy Court lifted the automatic stay to permit continued adjudication of the issues raised in the state court action.[197]  The Bankruptcy Court, however, specifically reserved its sole authority to enforce any final judgment of the state court as to the issue of non-dischargeability.[198]  The state court held a proof hearing on debtors' fraudulent conduct towards the creditor, and found that the debtors "had engaged in a pattern of fraudulent activity, transferring properties among family members and their owned entities for as little as $10 and violating their promises" to the creditor.[199]  As for the debtors' debt, the state court judge "found it to be 'possibly

27

if not completely non-dischargeable'" on the basis of actual fraud.[200]  The state court subsequently issued an order of final judgment on default.[201]

Prior to entry of default, the creditor commenced an adversary proceeding in the Bankruptcy Court seeking non-dischargeability of its debt.[202]  After entry of the state court's order of final judgment on default, the creditor sought summary judgment, and attached the record from the state court's proof hearing.[203]  The debtors opposed on various grounds, and cross-moved for summary judgment as well.  The Bankruptcy Court granted summary judgment in favor of the creditor, giving "collateral estoppel effect to the findings of the state court."[204]  The debtors appealed to the District Court, arguing, among other things, that the Bankruptcy Court erred by giving collateral estoppel effect to the state court's findings of fraud.[205]

On appeal, the District Court held that the Bankruptcy Court properly applied New Jersey's doctrine of collateral estoppel.[206]  First, the Bankruptcy Court correctly identified that the factual issues in the state court action had a "common critical issue" with the adversary proceeding—*i.e.*, whether the debtors committed fraud.[207]  The District Court agreed with the Bankruptcy Court that the state court made a finding of actual fraud because it held a hearing, took testimony, and thoroughly analyzed the evidence presented.[208]  Therefore, it was appropriate for the Bankruptcy Court to adopt the state court's findings of fraud for purposes of summary judgment.[209]

Second, the District Court rejected the debtors' argument that the default judgment was not the result of "actual litigation" because of the state court's prior suppression of debtors' defenses based on the discovery sanction.[210]  Because of their discovery violations, the debtors were "precluded from presenting their defenses" and, as a result, argued that the default judgment had not been the result of "actual litigation."[211]  The District Court, however, disagreed and upheld the Bankruptcy Court's reliance upon *Docteroff* in finding that, despite their inability to defend

themselves, the debtors actually litigated the issue of fraud by their participation in the state court action, including filing "an answer to the complaint, fil[ing] moving papers, communicat[ing] with opposing counsel, and purportedly, in their view, attempt[ing] to comply with discovery orders."[212] Indeed, the District Court stated that the *Walters* case was "identical to *Docteroff* in every way that matters."[213]  The District Court explained:

> [i]n state court, the [debtors] were given ample warning and multiple opportunities to comply with discovery procedures, but chose not to do so.  As a result, they were eventually precluded from presenting their defenses. The [debtors], like the defendant in *Docteroff*, actively participated in the state court proceeding. They filed an answer, filed moving papers, communicated with opposing counsel, and engaged in discovery disputes. . . . Under those circumstances, it was proper for [the Bankruptcy Court] to find that the [Debtors] had actually litigated the case in state court for purposes of collateral estoppel. 'To hold otherwise would encourage behavior similar to [the debtors] and give litigants who abuse the processes and dignity of the court an undeserved second bite at the apple.'[214]

The District Court further explained that "New Jersey collateral estoppel principles are entirely consonant with the *Docteroff* holding.  A New Jersey court will apply collateral estoppel only when the defendant in the initial action had the opportunity to fully and actively participate in the actual trial, and the manner in which the trial was conducted merited a bar to relitigation of the issues determined."[215]  The District Court observed "[t]rue, New Jersey courts have denied collateral estoppel where the defaulting defendant did not have a full and fair opportunity to participate in the earlier proceedings."[216]  However, unlike in those cases, the *Walters* debtors had "ample opportunity to fully and actively participate in the state court case.  The default judgment against them was not a result of an attorney failure, of a lack of notice to them about any of the proceedings, or of their failure to attend a proof hearing.  Rather, it was a result of their abuse of the state court process.  That the [debtors] squandered their opportunity to fully and actively litigate their case" did not warrant the District Court "giving them another opportunity to do so."[217]

Concluding with the observation that the "collateral estoppel doctrine has its roots in equity[,]" the District Court held that it "would be far from equitable to reward the [debtors'] bad faith conduct in state court with another opportunity to litigate the issue of fraud in federal bankruptcy court. Therefore, [the Bankruptcy Court] properly found that for purposes of collateral estoppel, the [debtors] had fully litigated the issue of fraud in state court."[218]

As to the third element of collateral estoppel, the District Court found that the Bankruptcy Court correctly held that the state court judgment was a final judgment. The District Court observed that there was nothing in the record to suggest that the state court's judgment was "anything but final. The default was entered with due deliberation, after the [debtors] were given multiple opportunities to comply with discovery obligations."[219]  As to the fourth element of collateral estoppel, the District Court held that Bankruptcy Court properly found that the state court's determination of fraud was essential to its judgment."[220]  Lastly, the District Court held that, as the debtors and the creditor were both parties to the state court proceeding, the final element of collateral estoppel was met.  Therefore, the District Court affirmed the Bankruptcy Court's decision to give "collateral estoppel effect to the state court's finding of fraud."[221]

In a more recent decision, *In re Ehsan*, 579 B.R. 722 (Bankr. D.N.J. 2018), the Honorable Christine M. Gravelle held that a prior state court judgment entered by default because of the debtors' failure to provide discovery responses would not be given collateral estoppel effect under New Jersey law for purposes of a non-dischargeability proceeding.  In *Ehsan*, the creditors commenced a prepetition lawsuit in New Jersey state court against the debtors, asserting fraudulent diversion of their loan proceeds from the operation of their corporate borrower (of which one of the debtors served as its CEO) to fund a Ponzi scheme.[222]  The state court complaint in *Ehsan* contained counts for fraud and unjust enrichment.[223]  The debtor-defendants first filed their answer

and counterclaims *pro se*, before retaining counsel in the state court action.[224]    The *Ehsan* plaintiffs-creditors were served with discovery requests by the debtor-defendants who, in turn, also served their discovery requests.    While discovery disputes were ongoing, the debtors-defendants' attorney sought to be relieved as counsel due to non-payment of his fees.[225]    After the debtors-defendants failed to comply with the plaintiffs-creditors' discovery requests, the plaintiffs-creditors "moved to dismiss [debtors-defendants'] answers, affirmative defenses, and counterclaim with prejudice and to enter judgment." [226]    The motion was unopposed.    The state court then entered an order "striking [debtors-defendants'] answers, counterclaim and defenses with prejudice pursuant to N.J.R. 4:23–5(a)(2).    The order also entered judgment in favor of [p]laintiffs and against [d]efendants in the amount of $599,828.31."[227]    Judge Gravelle noted that the order did not "contain any findings of fact or conclusions of law, nor [did] the record . . . indicate that any such findings were placed on the record orally" in the state court litigation.[228]

After the debtors filed for bankruptcy, the creditors commenced non-dischargeability proceedings (which were consolidated), and moved for summary judgment on the basis that the state court default judgment should be accorded collateral estoppel effect on the issue of debtors' purported fraud.[229]    The creditors specifically relied on *Docteroff* for the basis of their relief requested.    Judge Gravelle contrasted the facts in both *Docteroff* and *Walters* with *Ehsan* and denied the creditors' request for summary judgment.

Judge Gravelle observed that the case before her presented a "difficult factual scenario."[230] The *Ehsan* debtors were admittedly untimely in their discovery responses, both before and after they retained (and then lost) counsel.[231]    Judge Gravelle remained "troubled by the fact that [debtors] filed a motion to strike the complaint in the [s]tate [c]ourt [l]itigation as a sanction for [p]laintiffs' failure to provide discovery, but when faced with a similar motion, [debtors] refused

to respond in kind with the production that was responsive to [p]laintiffs' requests."[232] Nonetheless, the Court determined that the debtors lack of responsiveness to discovery did not rise to the level of egregiousness by the debtors in either *Docteroff* or *Walters*.[233]  Judge Gravelle reasoned that:

> [w]hereas the *In re Docteroff* and *Walters* debtors were active participants in the discovery process and were willfully noncompliant with court orders which led to the entry of judgment, here it appears the [debtors] simply stopped participating in the [s]tate [c]ourt [l]itigation. They claim they could not continue because they could not afford to replace their attorney. The timing of the nonparticipation coincided with the discovery process, leading to the entry of the judgment as a discovery sanction.[234]

Although Judge Gravelle recognized that the debtors had notice of the motion requesting the discovery sanctions and entry of default, and the debtors failed to do "something, anything, to let the state court know that they wished to avoid the entry of judgment," she determined that the "nature of the non-participation in the portion of the [s]tate [c]ourt [l]itigation from which the judgment [was] entered" made her "reluctant to find that the matter of fraud was actually litigated for the purposes of collateral estoppel."[235]

Cognizant of the "reasoning behind the Third Circuit's decision in *In re Docteroff*—namely that the application of collateral estoppel to judgments based on discovery sanctions serves as a deterrent to those litigants who might otherwise abuse the court system"—Judge Gravelle reasoned that:

> simply applying a bright-line rule that a discovery sanction judgment collaterally estops any further litigation was not the intention of the court in *In re Docteroff*.  Such a rule would eviscerate the equitable considerations inherent in the principle of collateral estoppel. The specific facts of this case, in which the behavior of the Defendants does not seem to rise to the level of an abuse of the processes and dignity of the courts, preclude this Court from applying collateral estoppel herein.[236]

Judge Gravelle noted that there was "no transcript of any oral findings by the state court, as the matter was decided on the papers and no hearing was held. There were no written findings."[237] The only evidence before the state court were "short, conclusory certified statements of proof" by the creditors, which did not have adequate documentary evidence of the existence of loans made nor why the liability of the debtor-affiliated company should be imputed to the individual debtors.[238] Judge Gravelle reasoned that this distinguished the case before her from the *Walters* decision, "where the state court judge held a proof hearing, took testimony, and thoroughly analyzed each element of fraud." [239]

Because the judgment before her "was primarily based on a discovery violation, as opposed to the fraud allegations underlying the complaint[,]" Judge Gravelle found that the "issue of fraud was not essential to the entry of the judgment," and, therefore, the fourth element of collateral estoppel could not be met.[240] In closing, Judge Gravelle noted that her "view may have been different if there had been a more robust record of the reasoning and findings of the state court."[241] However, in "the absence of a deeper understanding of that reasoning and, in light of the questions remaining as to some of the basic issues of fraud," Judge Gravelle held it would be "inequitable to estop [debtors] from presenting their proofs[.]"[242] Accordingly, Judge Gravelle denied creditors' motion for summary judgment.[243]

In analyzing whether collateral estoppel applies in this case, the Court need only examine the first four elements because the Parties do not dispute that they were each a party to the State Court Action.

### 1. <u>The Issues Here are Identical to the Issues Decided in the State Court Action</u>

The State Court Complaint sought relief on the basis of, *inter alia*, fraud, breach of fiduciary duty, and conversion. As set forth above, the State Court Complaint alleged as common

to all of its counts the same salient facts that give rise to Plaintiffs' claims for non-dischargeability in this adversary proceeding, including that:[244] (1) Debtor defrauded Plaintiffs; (2) Plaintiffs relied upon the Property Schedule prior to entry into the Original Notes and without knowledge of its material omissions and errors; (3) Debtor provided the Property Schedule to induce them to lend; (4) Debtor converted the Company's funds (and the Plaintiffs' loan proceeds) for his personal use, including acquisition of the Hasbrouck Heights Property; (5) pursuant to the terms of the Operating Agreement, Debtor, as Managing Member, had day-to-day control of the Company's operations and owed a duty of loyalty to the Company and breached his fiduciary duties by depleting the Checking Account; (6) Debtor failed to acquire the Littleton Property, and never disclosed to Plaintiffs that it had been purchased by PSE&G; (7) Debtor deceived Plaintiffs by requesting extensions of the Original Notes without disclosing that, by that time, the Littleton Project had become a factual impossibility; (8) Plaintiffs granted the extensions of credit; and (9) Debtor subsequently defaulted on the Extended Notes and failed to make the June Interest Payment.

These allegations are the same facts presented to this Court with respect to all six grounds of non-dischargeability asserted just as the causes of action are replicated here. Accordingly, the Court finds that this first factor weighs in favor of giving collateral estoppel effect to the Judgment and the *Lis Pendens* Order.

## 2. **The Parties Litigated the Same Issues in the State Court Action**

*Docteroff* provides this Court with authority to give collateral estoppel effect to the Judgment. Likewise, the Court is also guided by the analysis in *Walters*. The Court also agrees with Judge Gravelle that *Docteroff* cannot be read to impose a bright-line rule that a discovery sanction judgment collaterally estops further litigation where it does not appear that a debtor has had his day in court or at least an opportunity to be heard. So, the Court must reconcile these cases

since none are exactly the same.  Here, the Court finds that this case is more akin to *Docteroff* and *Walters*.  Debtor had ample opportunity to fully and actively participate in the State Court Action—yet he chose *not* to do so <u>and</u> the State Court Opinion contains specific findings based upon an evidentiary hearing.

In the State Court Action, Debtor hired an attorney and filed an answer denying Plaintiffs' factual allegations and asserting fourteen (14) separate defenses.  After filing his answer, Debtor went silent, without explanation, despite having counsel.  After Debtor defaulted on his discovery obligations, Plaintiffs requested entry of default. Default was entered, and Judge Langan then issued the Judgment. Debtor had notice of the Judgment.  He never appealed it.  Importantly, and different from existing caselaw, while the Judgment was final, it did *not* conclude the Parties' litigation or result in closure of the case.  It concluded a portion of the liability and damages. Rather, Plaintiffs' constructive trust claim (one portion of the Complaint) was bifurcated to permit separate judicial determination as to whether the *Lis Pendens* should remain as a lien on the Hasbrouck Heights Property.

As stated, Judge Langan held an evidentiary hearing and heard testimony.  Debtor received notice of the evidentiary hearing.  Debtor had counsel.  Neither he nor his counsel appeared.  Rather than defend himself, Debtor chose to leave it to the Intervening Defendants to defend his actions and their right to clean title on the Hasbrouck Heights Property—even though the factual issues to be decided at the *Lis Pendens* evidentiary hearing directly related to Debtor's diverting and converting Company funds  and injury to Plaintiffs' economic interests.

Debtor had notice of the *Lis Pendens* Order.  He never appealed.  Debtor never argues that his failure to participate post-answer in the State Court Action was due to lack of notice, or attorney error, or his inability to afford (or need to replace) counsel.[245]  That the Debtor "squandered" his

opportunity to fully and actively litigate his case before Judge Langan does not warrant this Court giving him another opportunity to do so.[246]  Permitting such selective participation by the Debtor encourages litigants to "abuse the processes and dignity of the court" and receive an "undeserved second bite at the apple."[247]  Importantly, it would also be highly inequitable to require the Plaintiffs, with the same documents and the same witness, to litigate anew the exact same factual issues and causes of action in this Court that they already fully litigated before Judge Langan, especially since that decision also affected Intervening Defendants.  This Court cannot simply ignore Judge Langan's decision.  To do so would by highly inequitable.

### 3. The Judgment and the Lis Pendens Order are Final Judgments on the Merits

Debtor contends that the Judgment and *Lis Pendens* Order are not final judgments on the merits.  The Court disagrees.  They are sufficiently final.  Nothing in the record to indicates that Judge Langan had any intention of revisiting the issues that he already decided.  Judge Langan had could have revisited the Judgment in the context of the *Lis Pendens* evidentiary hearing.  Judge Langan did not do so.  Instead, Judge Langan made findings, some favoring the  Debtor, but more in favor of the Plaintiffs.  Judge Langan found that the Debtor, at least in part, may have spent some of his own money from the Checking Accounts and that at least some of the expenses paid out of the Checking Accounts appeared to relate to the Company.  Important to this case, Judge Langan explicitly found that the Debtor diverted the Company's funds for the acquisition of the Hasbrouck Height Property, which included findings consistent with the Plaintiffs' allegations in the State Court Complaint.  Judge Langan also expressly found that the Hasbrouck Heights Withdrawal derived from the "$500,000 put into Littleton by the Plaintiffs."[248]

There is no question about the finality of the Judgment.  Debtor argues that the *Lis Pendens* Order was not final because the evidentiary hearing was a preliminary step in final imposition of

the *Lis Pendens*, and that the settlement effectively terminated the litigation.  Likewise, Judge

Langan made factual findings necessary to maintain the *Lis Pendens*.  Any future proceeding

regarding the *Lis Pendens* would not change the findings made by Judge Langan, but simply the

effect of those findings.  In other words, a measurement of the extent of the damages resulting

from what Judge Langan found to be the Debtor's unscrupulous behavior.  Again, this was a

separation of issues in the State Court Action.  However, it had no effect on the finality afforded

to the decisions being made.  Accordingly, the Court finds that this third factor also weighs in

favor of giving collateral estoppel effect to the Judgment and the *Lis Pendens* Order.

### 4.  <u>Judge Langan's Examination of the Same Issues Before this Court Was Essential to Entering the Judgment and *Lis Pendens* Order</u>

Judge Langan's determination of the factual issues in common with those raised in this

adversary proceeding was essential to his adjudication of the State Court Action.  Judge Langan

held an evidentiary hearing on the factual issues presented and took live witness testimony.  Mr.

Lewis provided direct testimony and was cross-examined.  Judge Langan also reviewed

documentary evidence, including many of the same documents presented to this Court—the

Property Schedule, the Operating Agreement, the Original Notes, the Extended Notes, and the

Checking Accounts' bank statements.[249]  In the State Court Opinion, Judge Langan specifically

found that the $55,000 used as a deposit for the Hasbrouck Heights Property was sourced from the

Plaintiffs' loan proceeds.[250]  Judge Langan stated:

> [i]t was . . . quite evident on cross examination [of Mr. Lewis] that
> the $55,000 came from the Littleton monies meant to develop the
> [Littleton Property], and that Mr. Russo diverted it to acquire the
> 230 Pasadena property in the name of 230 Pasadena, LLC.  Mr.
> Russo also formed 230 Pasadena LLC for the purpose of acquiring
> the property in Hasbrouck Heights, naming himself as the sole LLC
> member and then later transferring that interest to his sister.

> Mr. Lewis did establish to this Court's satisfaction that the $55,000
> for the down payment on the Hasbrouck Heights property was taken
> out of the $500,000 put into Littleton by the Plaintiffs.[251]

Judge Langan also found that Debtor inflicted "significant harm" on both the Plaintiffs and the

Intervening Defendants as a result of his conversion of Plaintiffs' loan proceeds away from

Littleton Associates.[252]  Judge Langan held the Intervening Defendants and Plaintiffs:

> were harmed by the actions of Mr. Russo, which is obvious from the
> testimony elicited before this Court and the documents presented.
> [The Plaintiffs] have lost a substantial amount of money, and the
> [Intervening Defendants] currently have their property encumbered
> after acquiring it in a sale from an unscrupulous businessman.[253]

Pursuant to the *Lis Pendens* Order, Judge Langan ordered that the *lis pendens* would "remain in

place . . . to reflect a lien not to exceed $55,000 encumbering" the Hasbrouck Heights Property

"pursuant to the findings and ruling set forth" in the State Court Opinion.[254]

Therefore, unlike *Ehsan*, and more so like *Walters*, this Court has findings of fact and

conclusions of law from the State Court Action, based on live testimony and documentary

evidence, as to Debtor's diversion of the Littleton Project's funds for the purchase of the

Hasbrouck Heights Property, all done without Plaintiffs' knowledge.  By arguing that collateral

estoppel cannot apply here, Debtor invites this Court to ignore the entirety of Judge Langan's

decision.  The Court declines Debtor's invitation.

Accordingly, based on the facts of this case, the equities favor applying collateral estoppel.

**B.  <u>Non-Dischargeability under Section 523(a) of the Bankruptcy Code</u>**

"The overriding purpose of the Bankruptcy Code is to relieve debtors from the weight of

oppressive indebtedness and provide them with a fresh start."[255]  However, the Bankruptcy Code

is meant to discharge only the honest but unfortunate debtor.[256]  Thus, Congress adopted section

523 of the Bankruptcy Code "to discourage fraudulent conduct and to ensure that relief intended

for honest debtors does not inure to the benefit of the dishonest."[257]   The party objecting to the

dischargeability of a debt bears the burden of proving by a preponderance of the evidence that the

particular debt falls within one of the exceptions to discharge enumerated in section 523(a).[258]

Preponderance of the evidence means "[e]vidence which is of greater weight or more convincing

than the evidence which is offered in opposition to it; that is, evidence which as a whole shows

that the fact sought to be proved is more probable than not."[259]   "Exceptions to discharge are strictly

construed against creditors and liberally construed in favor of debtors."[260]

### 1.  Actual Fraud (11 U.S.C. 523(a)(2)(A))

Plaintiffs move for determination of non-dischargeability for actual fraud under section

523(a)(2)(A) of the Bankruptcy Code.  Section 523(a)(2)(A) provides that:

> (a) A discharge under section 727 . . . of this title does not discharge
> an individual debtor from any debt—
>
> > (2) for money, property, services, or an extension, renewal,
> > or refinancing of credit, to the extent obtained by—
> >
> > > (A) false pretenses, a false representation, or actual
> > > fraud, other than a statement respecting the debtor's or
> > > an insider's financial condition[].

Section 523(a)(2)(A) does not define the terms false pretenses, false representation, or actual fraud.

To prevail on a claim under this section, a party must prove by a preponderance of the evidence

that: "(1) the debtor made a misrepresentation; (2) at the time, the debtor knew the

misrepresentation was false; (3) the debtor made the misrepresentation with the intent and purpose

of deceiving the creditor; (4) the creditor relied on the misrepresentation; and (5) the creditor

sustained the alleged loss and damages as a proximate result of the misrepresentation."[261]

"Courts interpreting § 523(a)(2)(A) have regarded false pretenses, false representations,

and actual fraud as somewhat different concepts, although a claim based upon any of these actions

requires a showing of each the above factors."[262]    "False pretenses" or "false representations" include "implied misrepresentations or omissions by a debtor that foster a false impression."[263] Indeed, "the most common type of fraud for purposes of [subsection 523(a)(2)(A)] involves a deliberate misrepresentation or a deliberately misleading omission."[264]    Accordingly, "[b]ankruptcy courts have overwhelmingly held that a debtor's silence regarding material facts can constitute a false representation actionable under section 523(a)(2)(A)."[265]    Courts acknowledge that actual fraud is "more expansive than a mere misrepresentation and consists of any deceit, artifice, trick, or design involving direct and active operation of the mind[.]"[266]

Moreover, "[i]ntent to deceive may be established based on the facts and circumstances of an individual case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the part of the Debtor."[267]    A showing of reckless indifference to the truth of the representations coupled with the knowledge that it would induce the loan to be made is also sufficient to satisfy an intent to deceive.[268]    Therefore, determining whether a "debtor has the requisite fraudulent intent to warrant an exception to discharge is a subjective inquiry.    A creditor may prove such fraudulent intent by direct, as well as circumstantial, evidence.    Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive."[269]    A creditor's reliance on a fraudulent misrepresentation need only be justifiable under the circumstances.[270]

Plaintiffs' focus for purposes of section 523(a)(2)(A) is their extension of credit to the Debtor in connection with the Extended Notes.    Plaintiffs argue that Debtor's omission of two material facts at that time demonstrate his intent to deceive them in obtaining the extension of credit.    First was Debtor's failure to disclose that the Checking Accounts had been depleted and closed.    Second was Debtor's failure to disclose PSE&G's purchase of the Littleton Property.

Plaintiffs assert that it is "illogical to believe Plaintiffs would have agreed to the Extended Notes had they known these facts."[271] Plaintiffs assert that, absent knowing these facts, they had "no reason to doubt the Debtor's ostensible ability to repay" the Extended Notes.[272]

In the first instance, the Court finds that collateral estoppel applies because Count II of the State Court Complaint specifically sought to recover on the basis of Debtor's "fraud", alleging, *inter alia*, that (1) Debtor "engaged in a scheme to defraud Plaintiffs by means of fraudulent misrepresentations"; (2) Plaintiffs detrimentally relied on those "false statements and fraudulent misrepresentations"; and (3) they were "damaged" as a result.[273] Further, Judge Langan found that: (1) Debtor failed to disclose his use of the Company funds in contravention of the Operating Agreement; (2) Debtor failed to disclose to Plaintiffs his purchase of the Hasbrouck Heights Property; (3) Plaintiffs relied on Debtor's misrepresentations; and (5) Plaintiffs sustained losses and damages as a proximate result of Debtor's misrepresentations and omissions. Therefore, taken together, the Judgment and *Lis Pendens* Order reached the merits of Debtor's false pretenses, false representations, and fraud. Requiring the Plaintiffs to relitigate these issues is inequitable.

Even if collateral estoppel does not apply, Plaintiffs submitted ample evidence to establish by a preponderance that each of the factors courts consider in a section 523(a)(2)(A) analysis have been met. Debtor failed to provide adequate rebuttal evidence to the contrary. The Court agrees that Debtor's intent to deceive Plaintiffs can be reasonably inferred from his failure to disclose depletion of the Company's Checking Accounts and sale of the Littleton Property to PSE&G prior to the Parties' entry into the Extended Notes. As of April 30, 2012, Checking Account 1 had a negative balance of $1,992.44. Coincidentally, just days prior, Debtor opened Checking Account 2 with the remaining $375,000 of the $500,000 loaned by Plaintiffs. On May 2, 2012, Debtor transferred $1,992.44 from Checking Account 2 into Checking Account 1 to cover the overdraft

deficit.  Checking Account 1 was subsequently closed by July 2012.  Checking Account 2 endured

an equally short fate.  Despite the Debtor Deposits, Debtor continued to utilize Checking Account

2 and  failed to disclose his use of Company funds for personal purchases to Plaintiffs.  By January

15, 2013, Checking Account 2 also had a negative balance.  Debtor never disclosed to Plaintiffs

that the entirety of their loan proceeds had been spent prior to the loan extension in April 2013.

Debtor's intent to deceive Plaintiffs is placed in context when considering that PSE&G

purchased or was in the process of purchasing the Littleton Property at the time the extension was

requested—a fact that Plaintiffs assert was not disclosed to them.   Debtor disputes whether he

made this omission.  Debtor claims that he or the Financial Advisors disclosed it to Plaintiffs as

soon as he learned of it.  Even if there was no disclosure, Debtor claims that Plaintiffs should have

known of the sale because it had been publicly announced.  Plaintiffs dispute this assertion, and

counter that they did not become aware of the PSE&G sale until months after entry into the

Extension Notes.  Plaintiffs further assert that Debtor only advised them of the sale after they

inquired about a news article regarding it in the summer of 2013.  Just because the Debtor says

there is a dispute does not automatically require denial of summary judgment.  Especially when

Debtor seeks to put forth two alternative factual positions.

It is undisputed that no written communication exists from Debtor to Plaintiffs verifying

this alleged disclosure.  Plaintiffs assert they would have never granted the extension had they

known of this fact.  Debtor failed to produce *any* evidence of his alleged disclosure other than a

bald assertion.  At the time the Parties entered into the Extended Notes, the Company no longer

possessed the funds to purchase the Littleton Property and the Littleton Property was no longer on

the market.  In other words, the Littleton Project had become a factual impossibility and the

Company could no longer fulfill its purpose, which was to develop the Littleton Property.  Once

42

the Littleton Project became a factual impossibility; all monies were depleted from the Checking Accounts; and the financial forecast was abysmal from every direction; no reason exists for Plaintiffs to grant the Company or the Debtor, in his capacity as guarantor, an extension of time to repay the Original Notes. Indeed, Mr. Lewis testified, at the time Plaintiffs granted the extension, they believed "everything was still in good order" and they had "no indication that there were problems."[274] Debtor's failure to disclose these material facts to Plaintiffs at the time they extended the Original Notes demonstrates Debtor's intent to deceive.

The Court notes Debtor attempts to blame the Financial Advisors and other partners as the parties requesting the extension. However, it is irrelevant as to who requested the extension. The fact remains that Debtor, as both Managing Member and guarantor, was involved in the extension. Further, Debtor never disputes his involvement. He tries to obfuscate the issue by trying to create disputes. The Debtor failed to disclose the depleted Checking Accounts in violation of both the Operating Agreement and his responsibility as Managing Member.

The Court finds that the facts and circumstances surrounding the Extended Notes demonstrate Debtor's intent to deceive. Plaintiffs established by a preponderance of the evidence that: (1) at the time the Parties entered into the Extended Notes, Debtor made material omissions regarding the Littleton Project's continued feasibility, the Company's Checking Accounts, and Debtor's financial ability to repay as guarantor; (2) Debtor knew or should have known that his failure to disclose would result in a false impression of both the Company and the Debtor's ability to repay the Extended Notes; (3) Debtor made the omissions with the intent and purpose of deceiving the Plaintiffs; (4) Plaintiffs relied on Debtor's misrepresentations; and (5) Plaintiffs sustained the alleged loss and damages as a proximate result of Debtor's misrepresentations.

Therefore, this Court finds that Plaintiffs are entitled to summary judgment under 11 U.S.C.

§ 523(a)(2)(A).

### 2.  **False Financial Statement (11 U.S.C. § 523(a)(2)(B))**

Subsection 523(a)(2)(B) of the Bankruptcy Code provides that:

> (a) A discharge under section 727 . . . of this title does not
> discharge an individual debtor from any debt—
>
> > (2) for money, property, services, or an extension, renewal,
> > or refinancing of credit, to the extent obtained by—
> >
> > > (B) use of a statement in writing—
> > >
> > > > (i)      that is materially false;
> > > >
> > > > (ii)     respecting the debtor's or an insider's
> > > > financial condition;
> > > >
> > > > (iii)    on which the creditor to whom the
> > > > debtor is liable for such money,
> > > > property,    services,    or    credit
> > > > reasonably relied; and
> > > >
> > > > (iv)     that the debtor caused to be made or
> > > > published with intent to deceive[.]

Under section 523(a)(2)(B), a plaintiff has the burden of proving, by a preponderance of the

evidence, that the writing: (1) is materially false; (2) respects the debtor's or an insider's financial

condition; (3) was reasonably relied on; and (4) was made with intent to deceive.[275]

Here, the written statement at issue is the Property Schedule.  The Property Schedule was

presented to Plaintiffs prior to entry into the Original Notes.  Although Judge Langan did not

include an analysis of the Property Schedule in the *Lis Pendens* Order, it was presented to him as

an exhibit to the State Court Complaint and reviewed as part of the review in the *Lis Pendens*

proceeding.  The allegations in the State Court Complaint indicate Plaintiffs relied on the Property

Schedule in deciding to lend.  Therefore, the falsity of the Property Schedule is subsumed within

44

the Judgment's finding in favor of Debtor's fraudulent conduct towards the Plaintiffs and their

reliance on it in entering into the Original Notes.  On these grounds, the Court gives collateral

estoppel to the Judgment.

Alternatively, even if collateral estoppel does not apply, Plaintiffs met their burden under

section 523(a)(2)(B) by a preponderance of the evidence, entitling them to summary judgment as

a matter of law.   Plaintiffs assert: (1) the Property Schedule was materially false; (2) the Property

Schedule was drafted to demonstrate the Debtor's financial condition; (3) Plaintiffs reasonably

relied on the Property Schedule in connection with their lending decision and subsequent extension

of credit; and (4) Debtor knew the Property Schedule was incomplete yet the Debtor presented the

Property Schedule to the Plaintiffs anyway.[276]   An analysis under section 523(a)(2)(B) supports

Plaintiffs' assertions.

### a.  The Property Schedule is Materially False

"A materially false statement is 'an important or substantial untruth.'"[277]  "A finding of

material falsity may be premised upon the inclusion of false information or the exclusion of

information" regarding a debtor's financial condition.[278]   Section 523(a)(2)(B)(i) presents a

question of law that is determined by an objective standard.[279]   Under section 523(a)(2)(B)(i), a

statement is material if it is so substantial that a reasonable person would have relied upon it.[280]   In

other words, a court may consider whether the false statement was "capable of influencing" or

would have a "natural tendency to influence" a creditor's decision.[281]   As explained by the Third

Circuit:

> [t]he materiality prong of the 'material falsehood' test includes a
> certain reliance component. Under a materiality analysis, we refer
> to a creditor's reliance upon a false statement in the sense that an
> untruth can be considered important (or 'material') if it influences a
> creditor's decision to extend credit.  However, a statement can still
> be material if it is so substantial that a reasonable person would have

relied upon it, even if the creditor did not *in fact* rely upon it in the case at hand. [282]

No one disputes that the Property Schedule was false. To the contrary, Debtor concedes that point. Plaintiffs alleged in the State Court Action that the Property Schedule was false, and its falsity was essential to Plaintiffs' fraud claim. The Property Schedule substantially misstated the Whiton Properties' equity value because it failed to include known penalties, interest, and tax debt under the liabilities column. It also failed to disclose that certain Whiton Properties were in foreclosure and/or the subject of workout negotiations. So, the question is whether the Property Schedule's inaccuracies were material. In other words, were its contents such that a reasonable person would have relied upon them in considering whether to lend the Company funds for the Littleton Project, extend the repayment schedule and interest payments due on the loan and, most accept a guarantee of repayment from the Debtor under the Original Notes?

The Court finds that they were. The Debtor acknowledged that he created or caused the creation of the Property Schedule to assist potential partners in determining "the properties which [Debtor] owned at the time, the date purchased, the amount, the market value, the current debt and the mortgage[s] [on]" them.[283] The purpose of the Property Schedule was to provide potential partners with financial information about the Debtor. Indeed, Mr. Lewis testified that Plaintiffs believed they would, at a minimum, recover the face value of their loan plus interest in the event of a default because of Debtor's guarantee.[284] Plaintiffs' perception that Debtor's guarantee had value was backed by Debtor's representations that he was a "successful real estate developer,"[285] because Debtor included Whiton project amongst his achievements.[286] The Property Schedule substantiated Debtor's claim of financial strength and his past project's success because it falsely indicated an equity amount in excess of $5,800,000 for the Whiton Properties. Given the Parties' discussions at the initial stages of the Company formation and investment, it would have been

46

reasonable for any similarly situated creditor to be influenced by the Property Schedule's contents and form a belief that Debtor possessed an ability to repay monies loaned. There is no evidence to lead one to think otherwise. The errors on the Property Schedule show properties that are severely underwater to instead demonstrate equity of approximately $5,800,000. The Court finds that falsehood to be material.

### b. The Property Schedule is in Respect to the Debtor's Financial Condition

The Court next turns to whether the Property Schedule is in respect to the Debtor's financial condition. In *Lamar, Archer & Cofrin, LLP v. Appling*, the Supreme Court determined what "the phrase 'statement respecting the debtor's financial condition'" meant.[287] In doing so, the Supreme Court rejected the proposition that a "statement respecting the debtor's financial condition" means "only a statement that captures the debtor's overall financial status" because such a narrow interpretation would read "'respecting' out of the statute."[288] Instead, the Court held that:

> *a statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status.* A single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not. Naturally, then, a statement about a single asset can be a 'statement respecting the debtor's financial condition.'[289]

Consistent with the foregoing, courts in this district have interpreted the phrase "a statement respecting a debtor's financial condition" to include the type of information a potential lender would usually consider and its intended purpose.[290]

Here, the Property Schedule is a statement respecting the Debtor's financial condition. Since Whiton was wholly-owned by the Debtor, it has a direct relation to the Debtor's overall financial status. Debtor admits the Property Schedule was created to demonstrate certain

47

information about properties he owned for anyone involved in the Company or the Littleton
Project.  Debtor represented himself as a successful real estate developer and included amongst
his successes the Whiton project.  The Whiton Properties were thus presented as multiple assets
with a direct relation to and impact on Debtor's financial condition.  The Property Schedule was
created to help Plaintiffs determine whether Debtor was solvent and possessed the ability to repay,
in his capacity as guarantor, the Original Notes and the Extended Notes.  Debtor represented to the
Financial Advisors that he had the ability to repay the Original Notes—despite the fact that
Debtor's federal income tax returns show income of $8,895, $7,554, and $7,035 for the years 2009,
2010, and 2011, respectively, and losses of $162,173, $128,079, and $193,809 for the years 2012,
2013 and 2014, respectively coupled with the crippling liabilities saddling the Whiton properties.
Accordingly, the Court finds that the Property Schedule was in respect to the Debtor's financial
condition.

### c.  Plaintiffs Reasonably Relied on the Property Schedule

"Section 523(a)(2)(B)(iii) requires that the creditor actually relied on the written statement
and that such reliance was reasonable."[291]  Reasonability is judged by an objective standard, *i.e.*,
that "degree of care which would be exercised by a reasonably cautious person in the same business
transaction under similar circumstances.[292]  Accordingly, it is a fact-based analysis.  The Third
Circuit explained:

> [a] determination of reasonable reliance requires consideration of
> three factors: (1) the creditor's standard practices in evaluating
> credit-worthiness (absent other factors, there is reasonable reliance
> where the creditor follows its normal business practices); (2) the
> standards or customs of the creditor's industry in evaluating credit-
> worthiness (what is considered a commercially reasonable
> investigation of the information supplied by debtor); and (3) the
> surrounding circumstances existing at the time of the debtor's
> application for credit (whether there existed a 'red flag' that would

48

> have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).[293]

Plaintiffs allege in the State Court Complaint that they explicitly relied upon the Property Schedule in making the Original Notes. The Court will give collateral estoppel effect to the issue of Plaintiffs' reliance. Even if collateral estoppel does not apply, the record here establishes that Plaintiffs relied upon the Property Schedule in their decision to extend credit.

The issue is whether the reliance was reasonable. The Court need not impose the same standard courts impose upon institutional lenders. Rather, the standard is whether Plaintiffs exercised the same degree of care that a reasonably cautious person in the same business transaction under similar circumstances would have exercised. The Court finds that they did.

Plaintiffs are individual investors that were introduced to Debtor by their Financial Advisors. Debtor pitched the Littleton Project to them, and Plaintiffs relied upon his presentation materials and assurances of past success. Mr. Lewis also visited the Littleton Property site on a few occasions. The Financial Advisors provided the Property Schedule—which painted a rosy financial picture for the Debtor—to the Plaintiffs. The Property Schedule exhibited a substantial amount of equity where it was non-existent. Debtor represented to the Financial Advisors that he had the financial ability to repay the Original Notes. Mr. Lewis testified that he also understood that Debtor had an ability to repay the Original Notes. Accordingly, Mr. Lewis testified that he did not retain any further professionals to help him with the transaction.[294] He and the other Plaintiffs individually negotiated the terms of their investment with Debtor, including the terms of the Original Notes and Operating Agreement. The Parties dispute whether Plaintiffs received the

Property Schedule prior to entering into the Extended Notes.  That dispute does not matter since they relied on it for the Original Notes and that is sufficient.

Debtor attacks the reasonableness of Plaintiffs' reliance on the Property Schedule on the basis that a review of public filings would have shown that the Whiton Properties were in foreclosure and/or subject to tax liens.  In other words, Debtor alleges a minimal investigation would have revealed the inaccuracies of Debtor's misrepresentations and omissions.  Debtor's position borders on ridiculous.  Debtor argues that he should be exonerated from being held liable for producing a materially false document because it was unreasonable for Plaintiffs to rely on it.  According to Debtor, Plaintiffs should not have given their trust to Debtor.  Debtor's correct.  Plaintiffs should have never trusted him.  But, under the circumstances, their trust was reasonable.

Certainly, Plaintiffs could have conducted further diligence on the Littleton Property, conducted further review of the Debtor's financials or retained their own separate attorney in negotiating the Operating Agreement and Original Notes.  Hindsight is always 20/20.  There is no standard market practice that applies to the facts of this case.  Unquestionably, the standard is not to blame the victims when they reasonably rely on untruths and inaccuracies.  Judge Langan found the Debtor to be "unscrupulous" and this Court agrees.[295]  As Judge Langan observed, the "informal manner in which Mr. Lewis became involved in lending monies to [Debtor] and his companies makes how unforeseen this harm was to the Plaintiffs even more clear."[296]  The Court finds Plaintiffs' reliance reasonable under the circumstances of this case.  Therefore, the Court finds that Plaintiffs reasonably relied upon the Property Schedule in making their lending decision.

### d. Debtor Caused the Property Schedule to Be Made with the Intent to Deceive Plaintiffs

Lastly, the Court must determine whether Debtor "caused" the Property Schedule to be made with the "intent to deceive."  Plaintiffs assert that for the purposes of section

523(a)(2)(B)(iv), it does not matter who presented the Property Schedules to them, so long as the Debtor caused the document to be made with the intent to deceive.  The subject of who caused the Property Schedule to be made was not at issue in the State Court Action.  Plaintiffs allege it was the Debtor and Debtor denies it.[297]

Debtor argues that the Financial Advisors created the Property Schedule and presented it to the Plaintiffs.  On this, the facts are vague.  However, the result is the same whether Debtor prepared the Property Schedule or simply provided the information that comprised the Property Schedule.  The statute is clear that the Debtor need not be the one who presents or makes the writing; he simply had to "cause [it] to be made."[298]  Debtor specifically testified in his deposition that he did just that—caused the Property Schedule to be made.  Relying on the facts as set forth by Debtor, Debtor caused the Property Schedule to be made.  Based on the facts already established, the Court finds that Debtor intended to deceive Plaintiffs with the Property Schedule each and every time it was presented as evidence of Debtor's creditworthiness and ability to repay.

In conclusion, the Property Schedule was: (1) materially false; (2) in respect to Debtor's financial condition; (3) reasonably relied on; and (4) made with intent to deceive.[299]  Accordingly, this Court grants summary judgment in favor of the Plaintiffs under 11 U.S.C. § 523(a)(2)(B).

### 3.  Fraud or Defalcation While in a Fiduciary Capacity (11 U.S.C. § 523(a)(4))

Plaintiffs also move for a determination of non-dischargeability under section 523(a)(4) of the Bankruptcy Code.  Section 523(a)(4) states in relevant part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

> > (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4) (emphasis added).  Under section 523(a)(4), Plaintiffs must prove Debtor committed (i) fraud or defalcation, (ii) while acting in a fiduciary capacity.[300]

Fraud for purposes of section 523(a)(4) is the same as is required for purposes of section 523(a)(2)(A).[301]  Accordingly, for the reasons articulated regarding section 523(a)(2)(A), the Court finds that Debtor is collaterally estopped from arguing that his actions were not equally fraudulent for purposes of section 523(a)(4).  As a result, the Court need not reach the issue of Debtor's purported defalcation.  If collateral estoppel does not apply, this Court relies on its own fraud analysis set forth in sections 523(a)(2)(A) and (B).

In examining section 523(a)(4), the first issue is whether Debtor was acting in a fiduciary capacity.  In the first instance, the Court finds that Debtor is collaterally estopped from arguing that he, as Managing Member, was not a fiduciary to the Plaintiffs and the Company.  Count IV of the State Court Complaint  specifically sought to recover damages based on Debtor's breach of fiduciary duty and the duty of loyalty.  The Operating Agreement specifically sets forth that all Members had a duty of loyalty to the Company and fiduciary obligations.  Therefore, Debtor is collaterally estopped from arguing otherwise.

Debtor, however, never really disputes that he was a fiduciary.  Rather, Debtor argues that being a fiduciary to the Company is not enough to establish that he was acting in a "fiduciary capacity" for purposes of section 523(a)(4).  Debtor asserts that section 523(a)(4)'s "notion of a fiduciary has been limited to situations where an express or technical trust has been established."[302]  Debtor argues that Plaintiffs can "point to nothing in the record to establish the creation of a trust, either express or technical."[303]  Plaintiffs, in response, assert that the Parties created an "express trust by virtue of the plain, express terms of the [Operating Agreement] and the specific purpose

of Plaintiffs' loan monies under the unambiguous terms" of the Original Notes and Extended
Notes.[304]

In its seminal decision *Davis v. Aetna Acceptance Co.*, the Supreme Court explained that
the meaning of the phrase "fiduciary capacity . . . speaks of technical trusts, and not those which
the law implies from the contract."[305]  In other words, the debtor "must have been a trustee before
the wrong and without reference thereto" because the statutory language applies "only to a debt
created by a person who was already a fiduciary when the debt was created."[306]

"To establish an express trust, three elements must be met: (1) a declaration of trust; (2) a
clearly defined trust *res*; and (3) an intent to create a trust relationship."[307]  In contrast, the
definition and scope of a technical trust is often more "difficult to determine.  Some courts have
determined that technical trusts for purposes of § 523(a)(4) can be created by state statutes.  Other
courts have found that state common law can create the requisite fiduciary relationship."[308]
"Notwithstanding the differences in the means of establishing these two types of trusts, the scope
of technical and express trusts is 'not limited to trusts that arise by virtue of a formal trust
agreement, but includes relationships in which trust-type obligations are imposed pursuant to
statute or common law.'"[309]

There is no case squarely on point.  However, this Court is guided by *In re D'Amore,* where
the court found that, as a matter of New Jersey law and "absent a  contrary provision in an LLC's
operating agreement, managing members of an LLC owe the traditional fiduciary duties of loyalty
and care to non-managing members of that LLC."[310]  The *D'Amore* decision thoroughly analyzed
New Jersey's Limited Liability Act,[311] Delaware cases on corporate law issues and drew inferences
from the law of limited partnerships.[312]  Further, New Jersey courts recognize that "[p]arties
engaging in conduct indicative of a purpose to create a trust relationship will invite the application

of the law of trusts to their transaction, notwithstanding the lack of an express declaration of a trust."[313]   Moreover, in the context of limited partnerships, New Jersey courts recognize that a partner's acceptance of title to property belonging to the partnership creates a trust-like relationship.[314]

Based on the facts of this case, the Court finds that the Operating Agreement and the Original Notes demonstrate an intent by the Parties to create a trust-like relationship as to the Company's use of Plaintiffs' loan proceeds.   Debtor was Managing Member of the Company. Under New Jersey law, if the Operating Agreement does not state otherwise (which it does not), Debtor owed a fiduciary duty of loyalty and care to Plaintiffs, who were non-managing members of the Company.   The Operating Agreement also specifically imposed on the Members a duty of loyalty to the Company.   Nothing in the Operating Agreement states otherwise. The Operating Agreement specifically empowered Debtor to undertake the day-to-day management of the Company's business.   Plaintiffs entrusted Debtor with the "power to perform all things in the normal course of business and for the usual operation of the Company without prior approval of the other Members."[315]   Debtor deposited the checks related to Plaintiffs' loans, opened and managed the Checking Accounts.   The proceeds of the Original Notes, which specifically stated that they were to be used in connection with the Littleton Project, were deposited into the Checking Accounts.   Debtor then used those proceeds for other purposes besides the Littleton Project, including the Hasbrouck Heights Property purchase.   Accordingly, the Parties established a trust relationship prior to the creation of the debt at issue here.

Debtor justified his personal use of Company funds due to the lack of compensation for his work, without any attempt to show compliance with the Operating Agreement.[316]   Debtor ignores that the Operating Agreement requires any employment agreement to be in writing.   Otherwise,

no Member could receive a salary from the Company. Debtor had no written employment agreement with the Company. Yet, Debtor paid numerous expenses for himself out of the Checking Accounts. In fact, he treated the Checking Accounts as if they were his own personal accounts without providing any of the accounting or reporting required. As if the spending for personal luxury items was not enough, Debtor diverted $55,000 from Checking Account 2 to purchase another property (Hasbrouck Heights Property) wholly unrelated to the Company and the Plaintiffs. That unauthorized purchase of the Hasbrouck Heights Property later produced a profit. Neither the Company nor Plaintiffs saw any of it. It is undisputed that Defendant never disclosed Debtor's use of Company funds for non-Company related purposes.

Accordingly, the Court finds that Debtor committed fraud while acting in a fiduciary capacity, and grants summary judgment in favor of Plaintiffs pursuant to 11 U.S.C. § 523(a)(4).

### 4. <u>Embezzlement (11 U.S.C. § 523(a)(4))</u>

For purposes of § 523(a)(4), embezzlement is defined as "the fraudulent conversion of the property of another by one who is already in lawful possession of it."[317] To prove embezzlement occurred under § 523(a)(4), a court must find that: (1) the debtor was entrusted; (2) with property; (3) of another; (4) which the debtor appropriated for his own use; (5) with fraudulent intent.[318] "Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."[319] Fraudulent intent may be inferred from a debtor's actions and surrounding circumstances.[320] "As commonly used, embezzlement requires conversion . . . of the property of another."[321]

Plaintiffs argue that the language of the Original Notes and the Operating Agreement expressly prohibits the use of the proceeds of Plaintiffs' loans for purchases unrelated to Littleton Associates or to the Littleton Project.[322] Plaintiffs further argue that "[a] cursory review of the

debits and withdrawals from the Company Accounts . . . show that the Debtor treated these accounts as his personal piggy bank to live a grandiose life for eleven months in 2012 until all of the money was gone."[323]   Debtor asserts there are issues of disputed fact as to whether the purchases and expenses he made from the Checking Accounts were authorized purchases and expenses in the ordinary course of the Company's business.[324]   Debtor contends that there were a "plethora of business debit card purchases and canceled checks which are clearly related to the business of" the Company.[325]   Debtor also argues that he deposited in excess of $228,915.91 of his "own funds and/or funds other than those contributed by Plaintiffs" into the Checking Accounts.[326]   With respect to the State Court Opinion, Debtor attempts to limit the findings just to the $55,000 used to purchase the Hasbrouck Heights Property, and notes that Judge Langan did not "address or set forth findings of fact or rulings of law as to the subsequent $797,522.83" contained in the Judgment.[327]   Accordingly, Debtor argues that a forensic accountant is required to resolve how each dollar was spent, its intended recipient, and its original source (Company vs. Debtor funds) for purposes of a determination of embezzlement.  Plaintiffs, in turn, dispute how Debtor was capable of depositing in excess of $228,915.91 into the Checking Accounts from his income or any other source given that his federal income tax returns showed a loss of $162,173 for the year 2012.[328]

The Court need not reach this dollar for dollar issue nor is a forensic accounting necessary. Here, the findings in the State Court Opinion embodied in the *Lis Pendens* Order collaterally estop Debtor's argument that he did not improperly convert Company funds to acquire the Hasbrouck Heights Property.  After reviewing the relevant documentary evidence and taking live witness testimony, Judge Langan specifically held that the monies used to purchase the Hasbrouck Heights Property "came from the Littleton monies meant to develop the [Littleton Property], and that Mr.

Russo diverted it to acquire the [Hasbrouck Heights Property] in the name of 230 Pasadena, LLC." [329] Judge Langan reached the merits of Debtor's conversion of Company funds as to a single transaction. This finding is adequate for purposes of non-dischargeability because there is no requirement to apportion "dischargeable" versus "non-dischargeable" damages once there is a final state court judgment on the merits of Debtor's unlawful conversion of even a single dollar of the Company's funds.[330]

Even if collateral estoppel does not apply here, the undisputed facts establish that: (1) Debtor was entrusted; (2) with property; (3) of another; (4) which the Debtor appropriated for his own use; and (5) with fraudulent intent. The first three factors have already been established in earlier discussions and the Court need not continue to repeat them.

In addition to the amounts diverted in connection with the Hasbrouck Heights Property, it is undisputed that Debtor made withdrawals from the Checking Accounts for personal use. Withdrawals from Checking Account 1 during the relevant time-period included payments to the Italian luxury clothing store Ferragamo (a $4,785 debit on March 26, 2012), retail and on-line stores such as Apple iTunes, Nike.com, Best Buy, Bed Bath & Beyond, and Sunglass Hut; daily debits for food and restaurants; and other personal expenses.[331] Even a cursory review of the bank statement for the lifetime of Checking Account 1 establishes that no genuine dispute exists that Debtor spent more on personal purchases than the $10,500 that he deposited into Checking Account 1.. Checking Account 1 was closed in July 2012. In less than six months, Debtor spent the entirety of the $125,000 sourced from the proceeds of the first Original Note. He also failed to purchase the Littleton Property.

Checking Account 2 suffered a similar fate. Withdrawals from Checking Account 2 included, in addition to the Hasbrouck Heights Property amount, daily debits for food and

restaurants, a vacation to the Bahamas (including a visit to the Atlantis Spa), and purchases at retail stores such as Bed Bath and Beyond, FAO Schwartz, and Bloomingdales.  By March 2013, Checking Account 2 was closed and the entire remaining balance of Plaintiffs' loan proceeds— $375,000—without completion of the Littleton Project.  Indeed, unbeknownst to the Plaintiffs, the Littleton Project had become a factual impossibility.

Debtor attempts to raise a factual issue as to his embezzlement of the Company's funds because he also deposited monies into the Checking Accounts.  Of course, if the Debtor had not comingled monies in the Checking Accounts, this would not be an open question.  True, Judge Langan found, and this Court's review of the record confirms, that Debtor made deposits in an approximate amount of $150,000 into the Checking Accounts.  Judge Langan also found that there were "numerous checks written" for purposes that "appear[ed] to legitimately concern" the Littleton Property, such as payments to "attorneys, engineers, architects and other professionals."[332]  In his opposition, Debtor attaches copies of numerous checks written from the Checking Accounts, but fails to identify their purposes.[333]  Further, Judge Langan reviewed those checks and still found the Debtor diverted money.  This Court agrees.  Debtor offers no evidence to rebut Plaintiffs' demonstration that Debtor used Company funds for his own personal benefit.

Accordingly, this Court grants summary judgment under 11 U.S.C. § 523(a)(4) for embezzlement.

## 5.  Larceny (11 U.S.C. § 523(a)(4))

Larceny under § 523(a)(4) "requires a showing that the debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to its own use without the owner's consent."[334]  "Larceny differs from embezzlement in that larceny requires the initial appropriation of the property to be wrongful" and be coupled with an "intent to convert or deprive

the owner" of the property.[335]  In other words, where embezzlement contemplates an initial, lawful entrustment of property, larceny relates to an unlawful taking of property.  The elements of larceny appear to conflict with this Court's findings regarding embezzlement.

Here, Debtor was entrusted with the Company's funds because the Operating Agreement empowered Debtor, as Member Manager, to manage the Checking Accounts and Plaintiffs entrusted Debtor to deposit the checks related to the Original Notes into the Checking Accounts. Even if that consent was procured fraudulently, Plaintiffs voluntarily loaned $500,000 to the Company in connection with the Littleton Project.  Therefore, even though Debtor converted the Company's funds for his personal use, it was under the guise of entrustment.  The Plaintiffs have not established by a preponderance of the evidence that Debtor's actions rose to the level of larceny.  Accordingly, the Court denies summary judgment on grounds of larceny pursuant to 11 U.S.C. § 523(a)(4).

### 6.  Willful and Malicious Injury (11 U.S.C. § 523(a)(6))

Section 523(a)(6) provides that: "(a) [a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—for willful and malicious injury by the debtor to another entity or to the property of another entity."[336]  Section 523(a)(6) requires an act to be both "willful" and "malicious."  The Supreme Court has held that only acts done with the actual intent to cause injury (as opposed to acts done intentionally that cause injury) fall within the ambit of section 523(a)(6).[337]  Therefore, debts arising from recklessly or negligently inflicted injuries do not fall within its scope.[338]

In discussing willful and malicious injury, the Supreme Court stated:

> [t]here is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception. . . . But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There

> may be a conversion which is innocent or technical, an unauthorized
> assumption of dominion without willfulness or malice. There may
> be an honest but mistaken belief, engendered by a course of dealing,
> that powers have been enlarged or incapacities removed. In these
> and like cases, what is done is a tort, but not a willful and malicious
> one.[339]

In evaluating whether a debtor's conduct is willful and malicious, the Third Circuit in *In re Conte*

endorsed an objective approach.[340]   Under the "objective approach," actions will be considered

willful and malicious if they "either have a purpose of producing injury or have a substantial

certainty of producing injury."[341]   In short, the "Bankruptcy Code requires at least a deliberate

action that is substantially certain to produce harm." [342]

Here, Plaintiffs argue Debtor's depletion of the Checking Accounts in less than a year

demonstrate that Debtor's actions are willful and malicious because they had a substantial certainty

of producing injury to Plaintiffs.[343]   The Court observes that, in the State Court Opinion, Judge

Langan found that Debtor inflicted harm on the Plaintiffs in connection with the Hasbrouck

Heights Property transaction:  Plaintiffs "were harmed by the actions of [Debtor]" and "lost a

substantial amount of money . . . ."[344]

Debtor is collaterally estopped from arguing that his diversion of Company funds did not

result in actual injury to the Plaintiffs.  And, even if collateral estoppel does not apply, the Plaintiffs

demonstrated injury arising from Debtor's actions.  Interestingly, instead of addressing Plaintiffs'

harm, Debtor asserts that he was equally harmed by the Littleton Project's failure because he also

deposited personal funds to initiate the development.  But his argument misses the point that his

actions as already explored in detail were "substantially certain" to injure the Plaintiffs. This

Debtor intentionally took actions to mislead and cause economic injury to Plaintiffs.  This Debtor

is not an honest and unfortunate debtor.  Every action taken by Debtor reeks of intentional

dishonesty resulting in injury to Plaintiffs.  Accordingly, summary judgment is granted in favor of

the Plaintiffs pursuant to 11 U.S.C. § 523(a)(6).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is GRANTED on

all grounds except larceny.  An appropriate Order will follow.

DATED: January 4, 2019

*Stacey L. Meisel*

Honorable Stacey L. Meisel
United States Bankruptcy Judge

---

[1]  Docket No. 14-10.  With lawful post-judgment interest accruing at 2.25% per annum ($49.16 per diem) through
the Petition Date, Plaintiffs estimate the Judgment amount to be $811,041.  *See* Docket No. 1, ¶ 67.

[2]  11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6) (2016).

[3]  Docket No. 14.  In support of the Motion for Summary Judgment, Plaintiffs submitted the *Declaration of Timothy
Lewis in Support of Motion for Summary Judgment* [Docket No. 14-4]. Mr. Lewis is the only Plaintiff that provided
most, if not all, information on behalf of the Plaintiffs either by testimony or certification in both the State Court
Action and this adversary proceeding.  Mr. Lewis is also the largest lender, having lent $250,000 to the Company
under the terms of his Original Notes.

[4]  The facts stated herein are taken from the Complaint, the Parties' briefs and exhibits submitted on the Motion, and
their statements of material facts submitted pursuant to Local Civil Rule 56.1 (made applicable to the Motion at the
time it was filed).   In paragraphs 3, 12, 13, 17, 21, 35, 41, and 45 of Debtor's Rule 56.1 statement in response to
Plaintiffs' Rule 56.1 statement, Debtor states that he is "without sufficient knowledge to either admit or deny
[Plaintiffs' corresponding statement] and leaves Plaintiffs to their proofs." Docket No. 18 ¶¶ 3, 12, 13, 17, 21, 35, 41
and 45. This is insufficient.  Debtor may not defeat summary judgment by stating only that Plaintiffs will "at some
later time uncertain be held to their proofs; the time to establish that evidence exists to rebut the proofs is now."
*Schwartz v. Hilton Hotels Corp.*, 639 F. Supp. 2d 467, 469 (D.N.J. 2009) (citing D.N.J. L. Civ. R. 56.1).  Therefore,
the Court deems undisputed each statement that Debtor neither admitted nor denied in his responsive statement.

[5]  Docket No. 14-5, Russo Dep. 33:12-25, 34:1-16, and 227:3-6; Docket No. 14-6, Lewis Dep. 13:15-14:11.

[6]  Docket No. 14-5, Russo Dep. 24:3-25:4 and Docket No. 14-6, Lewis Dep. 18:16-19:22.

[7]  Docket No. 14-5, Russo Dep. 34:12-24, 41:12-42:2 and 46:5-7; *see also* Docket No. 14-6, Lewis Dep. 51:9-12,
95:22-96:2.

[8]  *Id.* at 21:3-22:6 and 50:4-7.

[9]  Docket No. 14-1, ¶ 34 *as admitted by* Docket No. 18, ¶ 34  and Docket No. 14-5, Russo Dep. 55:16-21; 235:5-
236:2.  *See also* Docket No. 21-1, ¶ 1.

[10]  *See* Docket No. 14-1, ¶ 36 *as admitted by* Docket No. 18, ¶ 36.

[11]  Docket No. 14-5, Russo Dep. at 170:11-24.  *See also* Docket No. 14-1, ¶ 35 *as admitted by* Docket No. 18, ¶ 35.

[12]  Docket No. 14-17; *see also* Docket No. 14-1, ¶ 37 *as admitted by* Docket No. 18, ¶ 37.

[13]  Docket No. 14-5, Russo Dep. 66:1-67:3.

[14]  *Id.* at 55:6-15.

[15] Docket No. 14-6, Lewis Dep. 45:16-20.

[16] Docket No. 14-5, Russo Dep. 161:7-11.

[17] *Id.* at 40:5-7; 55:16-56: 8.

[18] *Id.* at 162:11-18.

[19] *Id.* at 164:6-17.

[20] *Id.* at 59:22-24 and 67:15-22.

[21] *Id.* at 57:22-58:8.

[22] *Id.* at 59:25-60:4.

[23] *Id.* at 56:4-11.

[24] Docket No. 14-6, Lewis Dep. 40.

[25] *Id.* at 104:15-17.

[26] *Id.* at 109:20-110:1-10.

[27] Docket No. 14-6, Russo Dep. 53:15-54:15 and 223:24-224:3.

[28] Docket No. 14-13.

[29] Docket No. 14-5, Russo Dep. 74:1-20; *see also* Docket No. 13, Schedule B and Docket No. 14-1, ¶ 15.

[30] *Id.*

[31] *Id.* at 3, ¶ 5.

[32] Docket No. 14-1, ¶ 17, *as admitted by* Docket No. 18, ¶ 17.

[33] Docket No. 14-12.  Two of the four Original Notes were between the Company and Mr. Lewis.  The Court was not presented with a copy of the Original Note executed by Ms. Webb.  Debtor attempted to challenge the existence and/or validity of Ms. Webb's Original Note.  Docket No. 18, ¶ 1.  However, Debtor also admits that Plaintiffs "disbursed their $500,000 under the Original Notes in four separate checks[.]"  *Id.* at ¶ 22.  Plaintiffs also provided a copy of Ms. Webb's Extended Note.  Docket No. 14-12 at 13-14.  Therefore, the Court concludes that Ms. Webb's Original Note is not in dispute.

[34] Docket No. 14-6, Lewis Dep. 27:24-28: 24 and 91:20-93:25.

[35] Docket No. 14-12.

[36] Docket No. 14-6, Ex. A, Russo Dep. 150:21-152:12.

[37] Docket No. 14-1 at ¶ 33 *as admitted by* Docket No. 18 at ¶ 33.

[38] Docket No. 14-6, Lewis Dep. 109:20-110:10.

[39] *Id.* at 106:5-9.

[40] Docket No. 14-14.

[41] Docket No. 14-15.

[42] Docket No. 18 at 5, ¶ 2.

[43] Docket No. 14-5, Russo Dep. 81:14-82:10 and 106:8-15.

[44] *Id.* at 112:11-20.

[45] Docket No. 14-6, Lewis Dep. 65:11-25 and Docket No. 14-5, Russo Dep. 203-204.

[46] *Id.* at 106:8-15.

[47] *Id.* at 114:1-115.

[48] Docket No. 14-5, Russo Dep. 108:1-109:2 and Docket No. 14-15 at 13.

[49] *Id.* at 120-121.

[50] Docket No. 14-15 at 6 and 13.

[51] Docket No. 14-5, Russo Dep. 109.

[52] *Id.* at 123:4-21.

[53] *Id.* at 125:10-20.

[54] Docket No. 14-16 at 27-29.

[55] Docket No. 14, ¶ 30.  In his *Responsive Statement of Material Facts and Supplemental Statement of Disputed Material Facts Pursuant to Civ. R. 56.1*, Debtor "denied this transaction was not disclosed to Plaintiffs."  Docket No. 18, ¶ 30.  This statement is yet another example of Debtor's counsel trying to create a factual issue where there is none.  Debtor testified that he did not disclose the Hasbrouck Heights Property transaction to the Plaintiffs.  Docket No. 14-5, Russo Dep. 117:18-25 and 118:1-5.  Debtor has not retracted or corrected this testimony.  Therefore, this factual issue is not in dispute.

[56] Docket No. 14, ¶ 32 and Docket No. 18, ¶ 32.

[57] Docket No. 14, ¶ 41 and Docket No. 14-5, Russo Dep. 130:8-11; *see also* Docket No. 18, ¶ 41 (Debtor's admission as to default on the Original Notes).

[58] *Id.*

[59] Docket No. 14-6, Lewis Dep. 98:20-99:7 and Docket No. 14-13.

[60] Docket No. 14-6, Lewis Dep. 98:25-99:7.

[61] Docket No. 18, ¶ 44 ("Denied that that 'debtor sought . . . the Extended Notes.' All other statements are admitted.").

[62] Docket No. 14-5, Russo Dep. 130:17-21.

[63] Docket No. 14, ¶ 44, Docket No. 14-12 at 7-14, and Docket No. 18, ¶ 44.

[64] Docket No. 14-17 at 7, 9, and 13. Mr. Halter and Ms. Murphy's Extended Note does not contain the June Interest Payment. This may be a drafting error because Mr. Lewis testified that the total due for the June Interest Payment under all the Extended Notes was $50,000. *See* Docket No. 14-6, Lewis Dep. 99:4-7.

[65] Docket Nos. 14-14 and 14-15.

[66] Docket No. 14-5, Russo Dep. 128:14-19, 130:6-11.

[67] *Id.* at 128-129.

[68] *Id.* at 128:2-8.

[69] *Id.* at 128-129.

[70] Docket No. 14-6, Lewis Dep. 99:8-12.

[71] *Id.* at 83:15-25 and 84-85.

[72] *Id.* at 84:19-23.

[73] Docket No. 14-1, ¶ 43.

[74] Docket No. 18, ¶ 43.

[75] Docket No. 14-5, Russo Dep. 145:12-13.

[76] Docket No. 14-8.

[77] Docket No. 14-8 at ¶¶ 11-32.

[78] *Id.* at ¶ 1.

[79] A copy of the Property Schedule is attached as Exhibit A to the State Court Complaint. Of note, an entity named Main Street Development Company, LLC was a named-defendant in the State Court Action. Debtor is identified as its principal. The State Court Complaint states that Debtor and Main Street provided the Property Schedule to Plaintiffs. The Property Schedule attached as Exhibit A to the State Court Complaint is the same as the one before this Court and identifies Whiton as the entity holding title to the properties listed therein.

[80] *Id.* at ¶ 15.

[81] *Id.* at ¶ 16.

[82] *Id.* at ¶ 17.

[83] *Id.* at ¶ 18. The Operating Agreement is attached as Exhibit B to the State Court Complaint.

[84] *Id.* at ¶ 19.

[85] *Id.* at ¶ 20.

[86] *Id.* at ¶ 23.

[87] *Id.* at ¶ 24.

[88] *Id.* at ¶ 26. Copies of the Original Notes are attached as Exhibit C to the State Court Complaint. Copies of the Extended Notes are attached as Exhibit D.

[89] *Id.* at ¶ 27.

[90] *Id.* at ¶ 28.

[91] *Id.* at ¶ 31.

[92] *Id.* at ¶ 32.

[93] Docket No. 14-1, ¶ 11 and Docket No. 18, ¶ 11.

[94] Docket No. 14-8 at 10.

[95] Docket No. 14-9.

[96] Docket No. 14-10.

[97] *Id.*

[98] *Id.*

[99] Docket No. 14-1 at 4.

[100] *Id.* at ¶ 13 and Docket No. 18, ¶ 13.

[101] Docket No. 14-11 at 2-3.

[102] *Id.*

[103] Docket No. 14-1, ¶ 13, *as admitted by* Docket No. 18, ¶ 13.

[104] *Id.* at 6 (emphasis added).

[105] *Id.* at 5 (emphasis added).

[106] *Id.*

[107] *Id.* at 6.

[108] *Id.* (emphasis added).

109  *Id.*

110  Docket No. 14-11 at 8.

111  *Id.* Judge Langan also entered a separate "Order Regarding Plaintiffs' Notice of Lis Pendens", dated April 8, 2015, which also ordered that the *Lis Pendens* would remain in place pending trial, and making the order effective, *nunc pro tunc,* as of the date of the State Court Opinion.

112  Docket. No. 14-6, Lewis Dep. 10:10-21.

113  Main Case Docket No. 1.

114  Main Case Docket No. 13 at 18.

115  *Id.*

116  Docket No. 1.

117  Docket No. 4.

118  Docket No. 13.

119  Docket No. 16.

120  Docket No. 20.

121  Docket No. 14.

122  Docket No. 18.

123  Docket No. 21.

124  *Id.* at 8.

125  Docket No. 25.

126  Docket No. 26.

127  *Id.*

128  FED. R. CIV. PRO. 56(a); FED. R. BANKR. P. 7056.  The quoted language derives from the 2010 revision of Rule 56(a), which replaces prior Rule 56(c).  Notably, it replaces "genuine issue of material fact" with "genuine dispute as to any material fact."  Many of the cases cited herein predate the change to the Rule utilizing the older terminology.

129  *Anderson v. Liberty Lobby,* 477 U.S. 242, 250 (1986); *see also Justofin v. Metropolitan Life Ins. Co.,* 372 F.3d 517, 521 (3d Cir. 2004).

130  *Celotex v. Catrett,* 477 U.S. 317, 323 (1986); *Knauss v. Dwek,* 289 F. Supp 2d 546, 549 (D.N.J. 2003).

131  *Celotex,* 477 U.S. at 323.

132  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Sempier v. Johnson & Higgins,* 45 F. 3d 724, 727 (3d Cir. 1995).

133  *Am. Eagle Outfitters v. Lyle & Scott, Ltd.,* 584 F.3d 575, 581 (3d. Cir. 2009).

134  *Matsushita,* 475 U.S. at 586.

135  *Anderson,* 477 U.S. at 249.

136  *Dehart v. Horn,* 390 F.3d 262, 267 (3d Cir. 2004) (*citing Anderson,* 477 U.S. at 248).

137  FED. R. CIV. P. 56(e)(2).

138  *Schwartz,* 639 F.Supp.2d at 469 n. 2 (Plaintiffs' failure to either admit or deny defendant's statement of undisputed facts and leaving them "to their proofs" was "insufficient."  "Plaintiff may not defeat summary judgment by stating only that defendants will at some later time uncertain be held to their proofs; the time to establish that evidence exists to rebut the proofs is now.").  *See also* D.N.J. Local Rule 56.1 (2016) ("The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.") (emphasis added).

139  *Anderson,* 477 U.S. at 252.

140  *Tomalewski v. State Farm Life Ins. Co.,* 494 F.2d 882, 884 (3d Cir. 1974).

141  *Id.*

142  *Id.*

143  *Knauss,* 289 F. Supp. 2d at 549 (*citing Anderson,* 477 U.S. at 249).

144  Docket No. 14-11 at 5.

145  Docket No. 18-1.

146  *Grogan v. Garner,* 498 U.S. 279, 284-285 n. 11 (1991); *In re Docteroff,* 133 F.3d 210, 214 (3d Cir. 1997); *In re Aiello,* 660 F. App'x 179, 182 (3d Cir. 2016) (further citations omitted).

147  *See In re Docteroff,* 133 F.3d at 214.

148  *In re Bertolotti,* 470 B.R. 356, 359–60 (Bankr. W.D. Pa. 2012).

149  *Greenleaf v. Garlock,* Inc., 174 F.3d 352, 357 (3d Cir. 1999); *In re Docteroff,* 133 F. 3d at 214.

[150] *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008) (quoting *Twp. of Middletown v. Simon*, 193 N.J. 228 (N.J. 2008)).

[151] *In re Ehsan*, 579 B.R. 722, 727 (Bankr. D.N.J. 2018) (citing *Kozlowski v. Smith*, 193 N.J. Super. 672, 675, 475 A.2d 663 (App. Div. 1984)).

[152] *Pittman v. La Fontaine*, 756 F. Supp. 834, 841 (D.N.J. 1991) (citing *Culver v. Insurance Co. of North America*, 115 N.J. 451, 460, 559 A.2d 400 (N.J. 1989)) (emphasis added).

[153] *Id.* at 841–42 (D.N.J. 1991) (citing *Alfone v. Sarno,* 87 N.J. 99, 112 n. 9, 432 A.2d 857 (N.J. 1981)); *Taylor v. Engelhard Indus.,* 230 N.J.Super. 245, 253, 553 A.2d 361 (App. Div. 1989)).

[154] *Allesandra v. Gross*, 187 N.J. Super. 96, 105–6 (App. Div. 1982)).

[155] *In re Azeglio*, 422 B.R. 490, 495 (Bankr. D.N.J. 2010).

[156] *Zirger v. General Accident Ins. Co.*, 144 N.J. 327, 338 (1996) (quoting *McAndrew v. Mularchuk*, 38 N.J. 156, 161 (1962)).

[157] *In re Dawson*, 136 N.J. 1, 20–21 (1994) (quoting *State v. Redinger*, 64 N.J. 41, 45, 312 A.2d 129 (1973)).

[158] *In re Docteroff,* 133 F.3d at 217 (quoting Restatement (Second) of Judgments § 13 (1982)).

[159] *Id.* (citing *In re Brown,* 951 F.2d 564, 569 (3d Cir.1991)).

[160] *In re Dawson*, 136 N.J. at 20-21 (internal citations omitted).

[161] *See Wunschel v. City of Jersey City*, 96 N.J. 651, 658, 477 A.2d 329 (1984).

[162] *Leonelli–Spina v. Albro,* No. CIVA 09–1864 (PGS), 2010 WL 1380877, at *5 (D.N.J. Apr. 1, 2010), *aff'd sub nom. In re Leonelli–Spina*, 426 Fed. Appx. 122 (3d Cir. 2011) (citing *In re Ross*, 602 F.2d 604, 607 (3d Cir. 1979)).

[163] *In re Ehsan*, 579 B.R. at 728 (further citations omitted).

[164] *Pivnick v. Beck*, 326 N.J. Super. 474, 486 (App. Div. 1999), *aff'd*, 165 N.J. 670 (N.J. 2000) (further citations omitted).

[165] *Id.* (citing *Restatement (Second) of Judgments* § 28 (1980)).

[166] Docket No. 14-1, ¶ 6 *as admitted by* Docket No. 18, ¶ 6.

[167] *See In re Azeglio*, 422 B.R. 490, 494 (Bankr. D.N.J. 2010) (finding that collateral estoppel could not apply in a non-dischargeability proceeding where default judgment was entered after debtor failed to appear at a trial of which he had no notice); *In re Fisher*, Case No. 16-12991-ABA, Adv. Pro. No. 16-1377-ABA, 2017 WL 590306, at *7 (Bankr. D.N.J. Jan. 24, 2017) (Altenburg, J.) (holding that collateral estoppel would not apply where debtor was "not active in the presentation of evidence" in an arbitration proceeding); *Slowinski v. Valley Nat. Bank*, 264 N.J. Super. 172, 182–85, 624 A.2d 85, 90 (App. Div. 1993) (finding collateral estoppel did not bind party against whom default judgment was entered); *Allesandra v. Gross*, 187 N.J.Super. 96, 106 (App. Div. 1982) (stating that judgment entered by default does not constitute an issue actually litigated and therefore is not subject to collateral estoppel).

[168] *In re Ehsan*, 579 B.R. at 729-30 (further citations omitted).

[169] *Id.* at 730.

[170] *Id.*

[171] 133 F.3d 210 (3d Cir. 1997).

[172] 133 F.3d at 212-13.

[173] *Id.* at 213.

[174] *Id.*

[175] *Id.* at 213-214.

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Id.* at 215.

[180] *Id*.

[181] *Id*.

[182] *Id*.

[183] *Id.* at 216 (further citations omitted).

[184] *Id*.

[185] *See In re Azeglio*, 422 B.R. at 494 ("As their federal counterparts do, New Jersey courts also agree that collateral estoppel may not be applied in the case of a default judgment.") (citations omitted).

[186] Docket No. 18-1 at 5.

[187] *Id.*

[188] *Walters v. Tehrani*, No. CIV 2:13-6544 KM, 2015 WL 1815510, at *8–10 (D.N.J. Apr. 21, 2015), *aff'd sub nom. In re Walters*, 649 F. App'x 273 (3d Cir. 2016).

[189] *Id.* at * 1.

[190] *Id.*
[191] *Id.*
[192] *Id.*
[193] *Id.*
[194] *Id.* at * 2.
[195] *Id.*
[196] *Id.*
[197] *Id.*
[198] *Id.*
[199] *Id.* at *3.
[200] *Id.*
[201] *Id.*
[202] *Id.* at *4.
[203] *Id.*
[204] *Id.*
[205] *Id.*
[206] *Id.* at *8.
[207] *Id.*
[208] *Id.*
[209] *Id.*
[210] *Id.*
[211] *Id.* at *9.
[212] *Id.* at *8-9 (further internal citations and quotations omitted).
[213] *Id.* at *9.
[214] *Id.* (quoting *In Docteroff*, 133 F.3d at 215).
[215] *Id.* at *10 (further citations and internal quotations omitted).
[216] *Id.* at *10.
[217] *Id.*
[218] *Id.* at *11.
[219] *Id.* at * 12.
[220] *Id.*
[221] *Id.*
[222] *In re Ehsan*, 579 B.R. 722 at 724-725 (Bankr. D.N.J. 2018).
[223] *Id.* at 725.
[224] *Id.*
[225] *Id.*
[226] *Id.*
[227] *Id.* at 725-726.
[228] *Id.* at 726.
[229] *Id.* at 724.
[230] *Id.* at 730.
[231] *Id.*
[232] *Id.* at 731.
[233] *Id.*
[234] *Id.* at 732.
[235] *Id.*
[236] *Id.*
[237] *Id.*
[238] *Id.*
[239] *Id.*
[240] *Id.*
[241] *Id.*
[242] *Id.* at 733-734.
[243] *Id.* at 734.
[244] Docket No. 14-8 at ¶¶ 11-32.
[245] Docket No. 14-5, Russo Dep. 185-188.

[246] *Walters*, 2015 WL 1815510, at *10.

[247] *Docteroff*, 133 F.3d at 215.

[248] Docket No. 14-11 at 5.

[249] Docket No. 14-11 at 2.

[250] Docket No. 14-11 at 6 (emphasis added).

[251] *Id.* at 5 (emphasis added).

[252] *Id.* at 6.

[253] *Id.* (emphasis added).

[254] *Id.*

[255] *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995).

[256] *Grogan*, 498 U.S. at 291.

[257] *Starr v. Reynolds (In re Reynolds)*, 193 B.R. 195, 200 (D.N.J. 1996) (citations omitted).

[258] *Grogan*, 498 U.S. at 291.

[259] *In re Perkins*, No. 99-0979, 2000 WL 1010580, at *2 (Bankr. E.D. Pa. July 19, 2000) (internal citations and quotations omitted).

[260] *In re Cohn*, 54 F.3d at 1113.

[261] *Cochran v. Reath (In re Reath)*, 368 B.R. 415, 423 (Bankr. D.N.J. 2006) (further citations omitted).

[262] *In re Suarez*, No. 08-15732 (DHS), 2010 WL 1382110, at *14 (Bankr. D.N.J. Apr. 5, 2010) (further citations omitted).

[263] *In re Crawford*, 476 B.R. 890, 895 (Bankr. W.D. Pa. 2012) (citations omitted). *See also In re Draughon*, Case No. 06-70405, Adv. Pro. No. 06-7067, 2007 WL 7645346, at *5 (Bankr. W.D. Pa. Aug. 21, 2007) (In the vast majority of instances, a creditor must establish each of the following to prevail under § 523(a)(2)(A): (1) debtor obtained money, property or services from a creditor by a misrepresentation, fraudulent omission or deceptive conduct; (2) debtor was aware of the falsity or deceptiveness of the statement or conduct; (3) debtor intended to deceive the creditor; (4) the creditor justifiably relied on the statement or conduct; and (5) the creditor suffered damages that were proximately caused by debtor's statement or conduct.") (citing *Harmon v. Kobrin (In re Harmon),* 250 F.3d 1240, 1246 (9th Cir. 2001)).

[264] *In re Draughon*, 2007 WL 7645346 at *6.

[265] *In re Docteroff*, 133 F.3d at 216 (affirming bankruptcy court's finding that debtor's failure to disclose material information was adequate for a finding of actual fraud under 11 U.S.C. § 523(a)(2)(A); plaintiff was not required to demonstrate that debtor "affirmatively misled" them).

[266] *In re Suarez*, 2010 WL 1382110, at *15.

[267] *In re Kaltenbock*, No. ADV 12-22857-CMB, 2013 WL 3225077, at *2 (Bankr. W.D. Pa. June 25, 2013) (further citation omitted).

[268] *In re Cohen*, 185 B.R. 171, 177 (Bankr. D.N.J. 1994).

[269] *In re Giquinto*, 388 B.R. 152, 165–66 (Bankr. E.D. Pa. 2008) (internal citations and quotations omitted).

[270] *Field v. Mans*, 516 U.S. 59, 61 (1995).

[271] Docket No. 14-2 at 34.

[272] *Id.*

[273] Docket No. 14-10 at ¶¶ 37-39.

[274] Docket No. 14-6, Lewis Dep. 98:25 and 99:1-7.

[275] *In re Cohn*, 54 F.3d 1108, 1114 (3d Cir. 1995).

[276] Docket No. 14-2 at 27-30.

[277] *In re Robbins*, 562 B.R. 83, 106 (Bankr. E.D. Pa. 2016) (quoting *Cohn*, 54 F.3d at 1114 (quoting *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985)).

[278] *Id.* (quoting *In re Chryst*, 177 B.R. 486, 499 (Bankr. E.D. Pa. 1994)).

[279] *Id.* (citing *Cohn*, 54 F.3d at 1115).

[280] *Cohn*, 54 F.3d at 1115.

[281] *Id.*

[282] *Id.* at 1114.

[283] Docket No. 14-5, Russo Dep. 170:10-25.

[284] Docket No. 14-6, Lewis Dep. 40, 93:21-25 and 94:1-3.

[285] *Id.* at 35:8-15.

[286] Docket No. 14-6, Lewis Dep. 35:8-15.

[287] 138 S. Ct. 1752, 201 L. Ed. 2d 102 (2018).

[288] *Id.* at 1761.

289 *Id.* (emphasis added).

290 *Goodman v. Kleiman (In re Kleiman)*, Docket No. 05-06158 (RTL), 2007 WL 1480716 (Bankr. D.N.J. May 18, 2007).

291 *In re Robbins*, 562 B.R. at 109 (citing *Field v. Mans*, 516 U.S. 59, 68 (1995)).

292 *In re Cohn*, 54 F.3d at 1117 (citations omitted).

293 *Id.*

294 Docket No. 14-6, Lewis Dep. 49.

295 Docket No. 14-11 at 6.

296 *Id.*

297 Docket No. 14-9, ¶ 13.

298 *See* 11 U.S.C. § 523(a)(2)(B).

299 *In re Cohn*, 54 F.3d at 1114.

300 *In re Goepp*, 455 B.R. 388, 397 (Bankr. D.N.J. 2011).

301 *In re Verona*, 277 B.R. 66, 72 (Bankr. W.D. Pa. 2002) (citing *In re Chavez,* 140 B.R. 413, 423 (Bankr. W.D. Tex. 1992)).

302 Docket No. 25 at 9 (citing *In re Casini*, 307 B.R. 800, 818 (Bankr. D.N.J. 2004) (Lyons, J.) (citing *In re Kaczynski*, 188 B.R. 770 (Bankr. D.N.J. 1995) and *In re Scott*, 294 B.R. 620 (Bankr. W.D. Pa. 2003)). Debtor cites to *In re Casini* for the proposition that a director of an insolvent corporation may not be held to be acting in a fiduciary capacity with respect to its creditors for purposes of section 523(a)(4). However, *Casini* is distinguishable from the case at bench because, there, a director's fiduciary duty to creditors only arose upon the debtor's insolvency. Therefore, the *Casini* court found that there was no prior trust-like relationship between the director and creditor in those cases that merited an exception to discharge under section 523(a)(4).

303 Docket No. 25 at 10.

304 Docket No. 26 at 2.

305 *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333 (1934) (further internal quotations and citations omitted).

306 *Id.* (further internal quotations and citations omitted).

307 *In re Kaczynski*, 188 B.R. at 774 (further internal citations omitted).

308 *Id.* (further internal citations and quotations omitted).

309 *Id.* (further internal citations and quotations omitted).

310 *In re D'Amore*, 472 B.R. 679, 689 (Bankr. D.N.J. 2012) (Kaplan, J.) (further citations omitted).

311 The *D'Amore* case reviewed New Jersey Limited Liability Company Act, N.J.S.A. 42:2B–1, *et seq.*, which has since been repealed effective March 1, 2014. However, as already noted, the Operating Agreement was created in accordance with and pursuant to the New Jersey Limited Liability Company Act. (Docket No. 14-13).

312 *In re D'Amore*, 472 B.R. at 687-89.

313 *Matter of Gonzalez*, 262 N.J. Super. 456, 459, 621 A.2d 94, 95 (Ch. Div. 1992) (citing *Trenton Times Corp. v. United States,* 361 F.Supp. 222, 226 (D.N.J. 1973)).

314 *Citizens First Nat. Bank of New Jersey v. Bluh*, 281 N.J. Super. 86, 98, 656 A.2d 853, 858 (App. Div. 1995) (citing *D'Ippolito v. Castoro*, 51 N.J. 584, 588, 242 *A.*2d 617 (N.J. 1968); *Hirsch v. Travelers Ins. Co.,* 134 N.J.Super. 466, 470, 341 A.2d 691 (App. Div. 1975)).

315 Docket No. 14-13, ¶ 5.

316 Docket No. 14-5, Russo Dep:87:5-6.

317 *In re Duffy*, Docket No. 08-1912266 (NWL), 2010 WL 3260077, at *10 (Bankr. D.N.J. Aug. 18, 2010) (citing *In re Sherman*, 603 F.3d 11, 13 (1st Cir. 2010)).

318 *Hickman*, 2014 WL 348538 at *9 (citing *In re Scheller*, 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2001)). *See also Docteroff*, 133 F.3d at 217.

319 *In re Schlessinger*, 208 F. App'x 131, 133 (3d Cir. 2006) (citing *Moore v. United States,* 160 U.S. 268 (1895)).

320 *See In re Aiello,* 660 F. App'x 179, 183 (3d Cir. 2016) (citing *Rosen v. Bezner*, 996 F.2d 1527, 1534 (3d Cir. 1993)); *Hickman,* 2014 WL 348538 at *9 (citing *In re Bevilacqua*, 53 B.R. 331, 334 (Bankr. S.D.N.Y. 1985)). Under section 523(a)(4)(A) of the Bankruptcy Code, the phrase "while acting in a fiduciary capacity" modifies only the words "fraud or defalcation"; it does not modify the phrase "embezzlement or larceny." *In re Hickman*, 2014 WL 348538, at *9 (Bankr. D.N.J. Jan. 31, 2014) (further citations omitted). Therefore, a debtor does not need to act in a fiduciary capacity when committing larceny or embezzlement for the debt to be excepted from discharge under section 523(a)(4). *Hickman*, 2014 WL 348538 at *9 (citing *In re Giarratano*, 299 B.R. 328, 337 (Bankr. D. Del. 2003)).

321 *In re Truch*, 508 B.R. 616, 622 (Bankr. D.N.J. 2014) (Ferguson, J.) (further citations omitted).

322 Docket No. 14-2 at 23.

323 *Id.*

[324] Docket No. 18-1 at 6.

[325] *Id.* Debtor attached copies of checks issued to "attorneys, engineers, architects , and other professionals related to the [Littleton Project]." *See* Exhibit A to the *Certification of Alfredo Ramos, Jr.*, Docket No. 18-2.

[326] Docket No. 18-1 at 6-7.

[327] *Id.* at 5.

[328] Docket No. 21 at 5.

[329] Docket No. 14-2 at 5 (emphasis added).

[330] *In re Vincenza Leonelli–Spina*, 426 Fed.Appx. 122, 126 (3d Cir. 2011).

[331] Docket No. 14-14 at 7-8.

[332] Docket No. 14-11 at 5.

[333] Docket No. 18-2.

[334] *In re Truch*, 508 B.R. at 623 (further citations omitted).

[335] *In re Kaltenbock*, No. Adv. 12-22857-CMB, 2013 WL 3225077, at *3 (Bankr. W.D. Pa. June 25, 2013). *See also In re Schlessinger*, 208 Fed. Appx.131, 133 (3d Cir. 2006).

[336] 11 U.S.C. § 523(a)(6).

[337] *Kawaauhau v. Geiger*, 523 U.S. 57 (1998).

[338] *Id.* at 64.

[339] *Davis*, 293 U.S. at 332 (further internal citations and quotations omitted).

[340] 33 F.3d 303, 307 (3d Cir. 1994).

[341] *Id*.

[342] *Id*. at 309.

[343] Docket No. 14-2 at 27.

[344] Docket No. 14-11 at 6.